IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00455-DME-MEH

METROPOLITAN TRANSPORTATION AUTHORITY DEFINED BENEFIT PENSION PLAN MASTER TRUST and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MOLSON COORS BREWING COMPANY, a Delaware Corporation, MARK R. HUNTER, TRACEY I. JOUBERT, PETER H. COORS, PETER J. COORS, BETTY K. DEVITA, MARY LYNN FERGUSON-MCHUGH, FRANKLIN W. HOBBS, ANDREW T. MOLSON, GEOFFREY E. MOLSON, IAIN J.G. NAPIER, DOUGLAS D. TOUGH, LOUIS VACHON, ROGER G. EATON, CHARLES M. HERINGTON, H. SANFORD RILEY, and DOES 1 through 10, inclusive,

Defendants.

---

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

Lead Plaintiffs, the Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust ("MTADBPPMT") and Manhattan and Bronx Surface Transit Operating Authority Pension Plan ("MABSTOA") (together "Lead Plaintiffs" or "MTA Funds") by and through their attorneys, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") on behalf of themselves and all persons and entities, except Defendants and their affiliates as more particularly defined below, who purchased or otherwise acquired the publicly traded Class B Common stock of Defendant Molson Coors Brewing Company ("Molson" or the "Company") during the period of February 14, 2017 to February 12, 2019, inclusive (the "Class Period") and were damaged thereby ("the Class").

Lead Plaintiffs' allegations are based upon personal knowledge as to themselves and their actions and, as to other matters, on the investigation of Court-appointed Lead Counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein").  This investigation included review and analysis of, among other things: (i) Molson's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial

analysts; (iii) transcripts of Molson's conference calls with analysts and investors; (iv) Molson's press releases and presentations; (v) news and media reports; and (vi) data reflecting the trading and pricing of Molson Class B Common stock.  Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist and will further support the allegations set forth herein after a reasonable opportunity for discovery.

I.      **SUMMARY OF THE ACTION**

1.      This complaint arises out of Defendants' false statements and material omissions to the market beginning in February 2017 and ending in February 2019, which misled the market as to the strength of Molson's financial condition and internal control processes related to financial accounting.  In order to inflate the price of Molson's Class B Common stock during the Class Period, Defendants caused the Company to falsely report its financial results by overstating retained earnings, net income, and tax benefits and understating deferred tax liabilities.

2.      Molson is one of the world's largest brewers and has a diverse portfolio of owned and partner brands, including global priority brands Blue Moon, Coors Banquet, Coors Light, Miller Genuine Draft, Miller Lite, and Staropramen, regional champion brands Carling, Molson Canadian, and other leading country-specific brands, as well as specialty beers such as Creemore Springs, Cobra, Doom Bar, Henry's Hard and Leinenkugel.

3.      At the heart of Defendants' fraud are their false and misleading financial statements arising from Molson's $12 billion acquisition of SAB Miller's 58% interest in MillerCoors LLC ("MillerCoors").[1]  This acquisition resulted in deferred tax liabilities relating to the underlying assets and liabilities of MillerCoors totaling $399.1 million, an error of almost 20% that should have been recognized no later than December 31, 2016.

---

[1]     MillerCoors began as a joint venture between SAB Miller plc ("SAB Miller") and Molson to run their operations in the United States and Puerto Rico in July 2008.  By acquiring SAB Miller's interest in 2016, Molson acquired full ownership of the Miller brand portfolio outside of the U.S. and retained the rights to all brands that were in the MillerCoors portfolio for the U.S. market.

4.      Molson knew that upon the closing of the acquisition of MillerCoors, the outside basis of its investment in the partnership should have been reconciled to the book-tax differences related to the underlying partnership assets and liabilities and as a result, a deferred tax liability should have been recorded on Molson's books.   Yet Molson did not make the required adjustments to correct the financial statements because this evaluation would have decreased net income, earnings per share, and retained earnings and adversely affected the stock price.   Instead, in a blatant misuse of the facts, Molson failed to disclose its liabilities and continued to misstate its financials *for another eight consecutive quarters in order to inflate the book value of MillerCoors*

5.      In fiscal year ("FY") 2016 alone, the misstatement had the intended effect of understating the income tax expense by 37% and overstating net income by 20% as follows:

**Fiscal Year 2016 Consolidated Statement of Operations**
**(in millions)**

|  | As Reported | As Restated | % Change |
|---|---|---|---|
| **Income tax benefit (expense)** | $ (1,055.2) | $ (1,454.3) | **(37.82%)** |
| **Net income (loss)** | $1,998.9 | $1,599.8 | **(19.97%)** |
| **Net income (loss) attributable to MCBC** | $1,993.0 | $1,593.9 | **(20.03%)** |
| **Basic net income (loss) attributable to MCBC per share** | $9.40 | $7.52 | **(20.00%)** |
| **Diluted net income (loss) attributable to MCBC per share** | $9.34 | $7.47 | **(20.02%)** |

6.      As the then Chief Accountant for the SEC noted in his remarks to the Tax Council Institute Conference[2] in Washington D.C., "financial reporting of income taxes is a very significant matter to the health and credibility of our capital markets" and "[a]ccurately

---

[2]      *See* Speech by SEC Staff: Remarks at the Tax Council Institute Conference on The Corporate Tax Practice: Responding to the New Challenges of a Changing Landscape, by Donald T. Nicolaisen, Chief Accountant, U.S. Securities and Exchange Commission ("SEC), Washington D.C., February 11, 2004 at https://www.sec.gov/news/speech/spch021104dtn.htm.

accounting for the income tax consequences of a company's transactions is critical to the credibility of the financial statements as a whole."

7.      On February 12, 2019, the Company stunned the market by finally admitting that its previously issued consolidated financial statements as of the years ended December 31, 2016 and December 31, 2017, as well as the consolidated balance sheets for three months ended March 31, 2018, six months ended June 30, 2018, and nine months ended September 30, 2018, should be restated and no longer relied upon.  Molson's stock fell sharply in the aftermath, dropping nearly 10%.

8.      When the material misstatements about Molson's financial reporting were finally disclosed, Molson was forced to admit that a material weakness existed in the Company's internal control over its financial reporting and that the Company's disclosure controls and procedures, and internal control over financial reporting were inadequate and "not effective."

9.      Defendants filed regular reports with the SEC and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that its quarterly and annual financial reports were reviewed by them and did not contain any material misrepresentations or omissions.  These certifications that Molson's financial reporting was accurate and that the Company's internal controls were adequate, were knowingly or recklessly false when filed.  As discussed below, Molson's financial reporting was not accurate and in fact, material weakness existed in the Company's internal controls.

10.      As a result of Defendants' positive (but false) statements about Molson's financial statements, investors, including Lead Plaintiffs, purchased Molson Class B Common stock at artificially inflated levels and were damaged when the truth was revealed and the artificial inflation was removed from the stock price, causing the stock price to decline.

## II.    JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal U.S. executive office is located in this District at 1801 California Street, Denver, Colorado.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

15.     Lead Plaintiffs MTADBPPMT and MABSTOA purchased Molson Class B Common stock during the Class Period, and suffered damages as a result of the Exchange Act violations and false and/or misleading statements and/or material omissions alleged herein.[3]

### B.    The Company

16.     Defendant Molson is a Delaware corporation and during the Class Period, its principal place of business was located in Denver, Colorado.  The Company's Class B Common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TAP."  Molson was incorporated in June 1913 under the laws of the state of Colorado.  In October 2003, Molson merged with and into Adolph Coors Company, a Delaware corporation.  In February 2005, Adolph Coors Company merged with Molson Inc.  Upon completion of the merger,

---

[3]     A copy of Lead Plaintiffs' certification and a chart of Molson share purchases during the Class Period is attached as Exhibit ("Ex.") 2 to the Declaration of Matthew Guiney in Support of the Motion of MTA Funds for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel. *See* Dkt. 36.

Adolph Coors Company changed its name to Molson Coors Brewing Company ("Molson").  On October 30, 2019, the Company announced that it will change its name to Molson Coors Beverage Company in January 2020.

### C.  Executive Defendants

17.     Defendant Mark R. Hunter ("Hunter") was the President and Chief Executive Officer ("CEO") of Molson from January 2015 until September 27, 2019.  On July 31, 2019, after reporting just one more quarter after the restated Molson financials were announced, the Company announced that Hunter would "retire" in September after nearly thirty years with Molson and it predecessors.[4]  Hunter was also a member of the Company's Board of Directors ("the Board") from 2015 until his retirement in September 2019.  Prior to becoming President and CEO of Molson, Hunter held the following positions: (i) President and CEO of Molson Coors Europe (January 2013 to December 2014); (ii) President and CEO of Molson Coors Central Europe (June 2012 to January 2013); and (iii) President and CEO of Molson Coors UK (December 2007 to June 2012).  Hunter served in various roles at Molson and its predecessor, Bass Brewers, since 1989.

18.     Defendant Tracey I. Joubert ("Joubert") abruptly became the Chief Financial Officer ("CFO") of Molson in November 2016.  The Company appointed Joubert after its former CFO, Maurico Restrepo ("Restrepo"), resigned due to matters involving personal conduct that violated Company policy.  Prior to becoming CFO, Joubert served as the CFO and Executive VP of MillerCoors from 2012 to November 2016.  Prior to 2012, Joubert served as VP of Finance, Planning & Analysis and Controller since the formation of MillerCoors in 2008.  Prior to joining

---

[4]     In September 2019, Gavin Hattersley ("Hattersley"), the then CEO of MillerCoors, replaced Hunter.  *See* http://ir.molsoncoors.com/news/press-release-details/2019/Molson-Coors-CEO-Mark-Hunter-Announces-Retirement-as-of-September-27-2019-Board-Names-MillerCoors-CEO-Gavin-Hattersley-as-Successor/default.aspx.   Prior to September 2019, Hattersley served as Interim CEO and then CEO of MillerCoors from July 2015 to September 2019.  *Id.*  From July 2008 to June 2012, Hattersley served as Executive Vice President ("VP") and CFO of MillerCoors.  *Id.*  He also served as Senior VP Finance for Miller Brewing Company from October 2002 to July 2008.  *Id.*  Hattersley holds an Honors' degree in accounting science and bachelor's degree from the University of South Africa and passed the Public Accountants and Auditor Board exams in 1987.  2017 Proxy (defined *infra*) at 44.

MillerCoors, she served as Director of Finance and Group Services at Miller Brewing Company. She began her "beer" career with SAB Limited ("SAB") in Johannesburg, South Africa, where she served as a Financial Manager of technical accounting and Financial Manager of finance services. Prior to joining SAB, Joubert was a Financial Manager at Barloworld, Ltd. and articled at KPMG South Africa. In November 2017, Joubert was appointed to the Board of Cooper Tire & Rubber Company (NYSE: CTB).

19.     Together Hunter and Joubert are referred to herein as the "Executive Defendants."

20.     As senior executive officers and as controlling persons of a publicly traded company whose stock was, and is, registered with the SEC pursuant to the Securities Act of 1933, and was traded on the NYSE and governed by federal securities laws, the Executive Defendants had a duty to promptly disseminate accurate and truthful information with respect to Molson's financial condition, balance sheets, financial reporting, the effectiveness of internal controls and processes, tax liabilities, net income and earnings, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Molson's stock would be based on truthful and accurate information.   The Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     Because of the Executive Defendants' positions with Molson, they possessed the power and authority to control the contents of Molson's reports to the SEC, press releases and presentations to the market.   The Executive Defendants were provided with copies of the Company's SEC reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, and because of their previous senior executive and management positions at MillerCoors and the Company, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations otherwise being made to the public were thus materially false and/or misleading. The Executive Defendants are liable for the false statements pleaded herein.

**Executive Compensation**

22.     During the Class Period, the Executive Defendants' compensation was dependent, in part, on the Company's stock price, successful management and certain financial targets.  According to the Company's Definitive Proxy Statement on Schedule 14A, dated April 4, 2019 ("2019 Proxy") (at 54), the total compensation package for Hunter and Joubert in 2018 totaled $8,341,482 and $2,428,643, respectively.   The breakdown of their compensation packages in 2016, 2017 and 2018 is set forth below:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mark R. Hunter President and CEO | 2018 | 1,222,525 | — | 4,283,451 | 1,100,007 | 1,577,057 | | 158,442 | 8,341,482 |
| | 2017 | 1,175,075 | — | 3,934,826 | 972,391 | 2,115,135 | 316,246 | 159,714 | 8,673,387 |
| | 2016 | 1,066,667 | — | 3,530,311 | 901,631 | 1,597,867 | 1,684,849 | 148,089 | 8,929,414 |
| Tracey I. Joubert CFO | 2018 | 662,188 | — | 938,931 | 240,012 | 455,623 | | 131,889 | 2,428,643 |
| | 2017 | 650,000 | — | 787,039 | 194,493 | 611,520 | 25,707 | 179,725 | 2,448,484 |
| | 2016 | 575,613 | — | 1,833,750 | 863,743 | 505,831 | 12,280 | 98,817 | 3,890,034 |

23.     According to the Company's Definitive Proxy Statement on Schedule 14A, dated April 5, 2017 ("2017 Proxy"), the 2016 Executive Compensation was based on three components:    a "Pay for Performance Compensation Mix," "Market Competitive," and "Opportunity."   2017 Proxy at 52.  According to the 2017 Proxy, "2016 business results were above the expectations we set for the Company and thus the compensation earned by our executives for 2016 was above target levels."  *Id.* at 51.  This conclusion was based, in part, on the Executive Defendants' dissemination of false financial information for Q4 2016, which deliberately overstated Molson's net income, earnings per share and retained earnings and failed to disclose a material weakness in Molson's internal control over financial reporting.

24.     The Company's Definitive Proxy Statement on Schedule 14A, dated April 5, 2018 ("2018 Proxy") reiterated the same Executive Compensation Policy.   The 2017 Compensation Highlights included exceeding the majority of the 2017 incentive targets "with balance and progress against both [the] bottom-line and top-line goals" and found alignment between the CEO pay and overall performance. 2018 Proxy at 12.   For 2017, "after another successful year," Hunter's base salary was increased by 9.1%.   This conclusion was again based on the Executive Defendants' dissemination of false financial information for FY 2016 and 2017 which failed to disclose a substantial material weakness in Molson's financial reporting and internal controls.

### D.  Board of Director Defendants

__Directors Divided by Director Class__

25.     The Molson Board has 11 directors elected by Class A Common stockholders and three directors elected by Class B Common stockholders.[5]   The directors by Class are as follows:

Class A Directors

| Name | Age[(1)] | Director Since | Primary Occupation | Committee Memberships | Independent |
|------|-----|-------|--------|-------|-----|
| Peter H. Coors | 72 | 2005 | Chief Customer Relations Officer, Molson | Nominating | NO |
| Peter J. Coors | 42 | 2015 | Senior Manager of Quality Assurance for MillerCoors LLC | Nominating | NO |
| Betty K. DeVita | 58 | 2016 | Chief Executive Officer of BetdevSolutions | Audit | YES |
| Mary Lynn Ferguson-McHugh | 59 | 2015 | Group President, Global Family Care and P&G Ventures, Procter & Gamble Co. | Compensation & HR | YES |
| Franklin W. Hobbs | 71 | 2005 | President and Chief Executive | Audit; | YES |

---

[5]     Molson has one class of common stock that trades on the NYSE under symbol "TAP"– Class B Common.  Class A Common has a small market and trades under "TAPA."  Holders of Class A Common have the ability to control the Company and elect a supra majority of the Board (11 directors), and the Class B Common shareholders only elect three directors.  Certain transactions (mergers, sales of assets, dissolution and certain amendments to the Certificate of Incorporation) give equal voting rights to both the Common Class A and Class B.  Molson also has Exchangeable Class A and Exchangeable Class B common stock which trades only on the Toronto Stock Exchange and are capital shares of Molson's wholly owned subsidiary, Molson Coors Canada, Inc., but provide the same economic and voting rights as the Class A and Class B Common.

| Name | Age | Director Since | Primary Occupation | Committee Memberships | Independent |
|---|---|---|---|---|---|
| | | | Officer, Ribbon Communications Inc. f/k/a Sonus Networks, Inc. | Finance | |
| Mark R. Hunter[6] | 56 | 2015 | President and CEO, Molson | None | NO |
| Andrew T. Molson | 51 | 2005 | Partner and Chairman, RES PUBLICA Consulting Group | Nominating | NO |
| Geoffrey E. Molson | 48 | 2009 | Owner, President and CEO, CH Group Limited Partnership | Nominating | NO |
| Iain J.G. Napier | 69 | 2008 | Director of William Grant and Sons Holdings Limited | Compensation & HR; Finance | YES |
| Douglas D. Tough | 69 | 2012 | Director of Molson | Compensation & HR | YES |
| Louis Vachon | 56 | 2012 | President and CEO, National Bank of Canada | Finance | YES |

Class B Directors

| Name | Age | Director Since | Primary Occupation | Committee Memberships | Independent |
|---|---|---|---|---|---|
| Roger G. Eaton | 58 | 2012 | Director of Molson | Audit | YES |
| Charles M. Herington | 59 | 2005 | Vice Chairman and President, Zumba Fitness, LLC | Audit | YES |
| H. Sanford Riley | 68 | 2005 | President and CEO, Richardson Financial Group Limited | Compensation & HR; Nominating | YES |

*See* 2019 Proxy at 11, 14-18.

## **Director Compensation**

26.  Director compensation for the year ended December 31, 2018 was as follows:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation[3] ($) | Total ($) |
|---|---|---|---|---|
| Peter H. Coors[1] | 190,000 | 145,026 | 8,220 | 343,246 |
| Peter J. Coors[2] | 100,000 | 145,026 | 8,220 | 253,246 |
| Betty K. DeVita | 100,000 | 145,026 | 8,492 | 253,518 |
| Roger G. Eaton | 120,000 | 145,026 | 24,235 | 289,261 |
| Mary Lynn Ferguson-McHugh | 100,000 | 145,026 | 8,220 | 253,246 |
| Charles M. Herington | 100,000 | 145,026 | 39,456 | 284,482 |
| Franklin W. Hobbs | 100,000 | 145,026 | 40,725 | 285,751 |
| Andrew T. Molson | 100,000 | 145,026 | 8,220 | 253,246 |
| Geoffrey E. Molson[4] | 190,000 | 145,026 | 97,440 | 432,466 |
| Iain J.G. Napier | 120,000 | 145,026 | 17,384 | 282,410 |
| H. Sanford Riley | 100,000 | 145,026 | 33,915 | 278,941 |
| Douglas D. Tough | 100,000 | 145,026 | 10,764 | 255,790 |
| Louis Vachon | 113,750 | 145,026 | 22,585 | 281,361 |

(1) In addition to his director compensation reflected in the table above, PH Coors entered into a thirty-six month fixed term employment agreement as Chief Customer Relations Officer which began on October 11, 2016. Per the agreement, PH Coors received an annualized base salary of $650,000 for the twelve months ended October 10, 2018 and will receive an annualized base salary of $550,000 for the twelve months ending October

---

6       Gavin Hattersley replaced Hunter on the Board following Hunter's retirement.

10, 2019. PH Coors also held cash settled RSUs on December 31, 2018 with a value of $224,640 and legacy pension benefits.

(2) In addition to his director compensation reflected in the table above, PJ Coors received compensation of $197,504, which included salary, bonus and equity awards, as a Molson employee.

(3) Represents dividend equivalents accrued in 2018 on various unvested stock units granted to directors are the only stock awards that accrue dividend equivalents prior to vesting.

(4) In addition to dividend equivalents accrued in 2018 on unvested RSUs and DSUs of $8,220, GE Molson received $89,220 in 2018 for consultant services rendered to Molson in his "ambassadorial role," both of which are shown in the "All Other Compensation" column above. A CAD to USD exchange rate of .7333 as of December 31, 2018 was used to convert GE Molson's ambassadorial role fees.

*See* 2019 Proxy at 30.

**Individual Director Defendants**

27.    Defendant Peter H. Coors ("PH Coors") has served as a Class A Director since 2005, Chairman of the Board since May 2017 and Chief Customer Relations Officer ("CCRO") since October 2016.  PH Coors also serves as a trustee and is Co-Chairman of Adolph Coors Company, LLC, the trust holding company of the Adolph Coors Jr. Trust ("Coors Trust") and other Coors' family trusts.  Since 1971, PH Coors has served in a number of different executive and management positions for Adolph Coors Company, Coors Brewing Company and Molson. At Coors Brewing Company, a wholly owned Molson subsidiary, he held the following positions:  Chairman of the Board (since 2002); director (since 1973); and CEO (1992 to 2000). At Adolph Coors Company, he served as CEO (2000 to 2002) and as Chairman of the Board (2002 to 2005).

28.    Defendant Peter J. Coors ("PJ Coors"), the son of PH Coors, has served as a Class A Director since 2015.  PJ Coors has been the Senior Manager of Quality Assurance for MillerCoors since November 2018 and also serves on the Board of Trustees for the Adolph Coors Company LLC and various Coors' family trusts.  PJ Coors has held various management positions in MillerCoors from October 2016 to late 2018.  He also served as the Brewery Manager at the MillerCoors Shenandoah Brewery from September 2014 to late 2016 and as Manager of Trade and Consumer Quality for MillerCoors.

29.    Defendant Betty K. Devita ("Devita") has served as an independent Class A Director since 2016 and is a member of the Board's Audit Committee.  Devita is the CEO of BetdevSolutions, a fintech advisory practice.  She previously served as the Chief Commercial

Officer at MasterCard Worldwide (May 2015 to February 2019) and as President of MasterCard Canada, Inc. (September 2010 to April 2015).  Before joining MasterCard, from 1982 to 2010, she held various positions with CitiGroup Inc., and left Citigroup Inc. as the Chairman and CEO for Citibank Canada Inc.  The 2019 Proxy lists her skills and qualifications to include the following: P&L management, operations, partnerships and advanced business degree.

30.     Defendant Mary Lynn Ferguson-McHugh ("Ferguson-McHugh") has served as an independent Class A Director since 2015 and is a member of the Board's Human Resources and Compensation Committees.  Ferguson-McHugh has served as Group President, Global Family Care and P&G Ventures at Procter & Gamble Co. ("P&G") since November 2015 and has been with P&G since 1986, in various roles.  Ferguson-McHugh holds an M.B.A. from the University of Pennsylvania, Wharton School of Business.

31.     Defendant Franklin W. Hobbs ("Hobbs") has served as an independent Class A Director since 2005 and is a member of the Board's Audit and Finance Committees.  Hobbs has served as President, CEO and director of Ribbon Communications Inc. since December 2017.  Hobbs is also an advisor to One Equity Partners and currently serves as the Chairman of the Board of Ally Financial Inc.  Hobbs previously served as a director of Molson Coors' predecessor company, Adolph Coors Company, since 2001.  Hobbs is a graduate of Harvard College and Harvard Business School.  The 2019 Proxy lists his skills and qualifications to include the following: financial expert, audit, P&L management, experienced CEO, knowledge of the company and long term director.

32.     Defendant Andrew T. Molson ("AT Molson") has served as a Class A Director since 2005 and is a member of the Nominating Committee.  AT Molson is chairman of RES PUBLICA.  AT Molson holds a law degree from Laval University, an M.S. in corporate governance and ethics from the University of London and a B.A. from Princeton University.

33.     Defendant Geoffrey E. Molson ("GE Molson") has served as a Class A Director since 2009 and has been a Vice Chair of the Board since May 2017.  GE Molson has been a general partner of CH Group Limited Partnership (which owns the Montreal Canadiens) since

December 2009 and the President and CEO since 2011.  He is also a director of RES PUBLICA and served as the Board's Chair from June 2015 to May 2017.  From 1999 to 2009, he held various positions at Molson Inc.  GE Molson holds an M.B.A. from Babson Business School and a B.A. from St. Lawrence University.

34.     Defendant Iain J.G. Napier ("Napier") has served as an independent Class A Director since 2008 and is a member of the Board's Compensation, HR and Finance Committees.  Since April 2008, Napier served as the senior independent director of William Grant and Sons Holdings Limited (a private company that produces and distributes spirits) and currently serves as the Chair of its Audit Committee.  From 2008 to 2017, he served as Chairman of the Board of McBride plc.  From September 2008 to May 2016 he served as a director of John Menzies plc, and acted as Chairman beginning in 2007.  From 2001 to 2006, he was CEO of Taylor Woodrow plc. From 2000 to 2001, he was Vice President U.K. and Ireland for InBev S.A. following its acquisition of Bass Brewers Ltd. and CEO of Bass Brewers and Bass International Brewers from 1996 to 2000.  Napier is a chartered global management accountant and a fellow of the Chartered Institute of Management Accountants, and served as a member of the Board's Audit Committee in 2016.  *See* Definitive Proxy Statement on Schedule 14A, dated April 15, 2016 ("2016 Proxy") at 21. The 2019 Proxy lists his skills and qualifications as follows: financial literacy and P&L management.

35.     Defendant Douglas D. Tough ("Tough") has served as an independent Class A Director since 2012 and serves on the Board's Compensation and Human Resources Committees.  Tough was the CEO and Chairman of the Board of International Flavors & Fragrances ("IFF"), a creator and manufacturer of flavors and fragrances, from March 2010 to September 2014.  Tough holds an M.B.A. from the University of Western Ontario and a B.B.A. from the University of Kentucky. The 2019 Proxy lists his skills and qualifications as: P&L management and an advanced business degree.

36.     Defendant Louis Vachon ("Vachon") has served as independent Class A Director since 2012 and serves on the Board's Finance Committee.  Vachon has served as President and

CEO of the National Bank of Canada since June 2007 and as a director since 2006. He also served as a director of Fiera Capital Corporation from April 2012 until January 2017. Vachon has a certification from the CFA Institute. The 2019 Proxy lists his skills and qualifications to include the following: financial markets, financing and advanced degree in international finance.

37. Defendant Roger G. Eaton ("Eaton") has served as an independent Class B Director since 2012 and serves on the Board's Audit Committee. Eaton served as the CEO of KFC, a division of Yum! Brands, Inc. (NYSE: YUM), from August 2015 to March 2019. Prior to that, he held several U.S. and international positions at Yum! Including: COO of Yum! (April 2011 to August 2015), President of a KFC overseas division (January 2014 to April 2015), and Operational Excellence Officer (2011). From June 2008 to February 2011, he served as the CEO and President of KFC USA. Eaton holds a post graduate diploma in accounting and a bachelor's degree in commerce from the University of Natal - Durban in South Africa. He passed the South African Public Accountants and Auditors Board exams in 1982 and is a member of the Australian Institute of Chartered Accountants. The 2019 Proxy lists his skills and qualifications to include the following: financial expert, P&L management, operations, finance and experienced CEO.

38. Defendant Charles M. Herington ("Herington") has served as an independent Class B Director since 2005 and serves on the Board's Audit Committee. Herington has served as Vice Chairman and President at Zumba Fitness LLC since August 2013. In May 2018, he was appointed to the board of Gildan Activewear, Inc. He also sits on the boards of Klox Technologies and Hy Cite Enterprises LLC. Herington previously served as a director of Adolph Coors Company since 2003. From March 2006 to August 2012, he held various management positions at Avon Products Inc. From 1999 to 2006, Herington was President and CEO of AOL Latin America. Prior to that, he served as President at Revlon Latin America from 1997 to 1999. From 1990 to 1997, he held a variety of executive positions, including division president with Pepsico Restaurant International. From 1981 to 1990, he held various marketing and executive

positions at P&G.  Herington holds a degree in Chemical Engineering and Systems from the Instituto Tecnologico y de Estudios Superiores de Monterrey.

39.     Defendant H. Sanford Riley ("Riley") has served as an independent Class B Director since 2005 and serves on the Compensation, Nominating and Human Resource Committees.  Riley has served as President and CEO of Richardson Financial Group Limited, a specialized financial services company, since 2003.  In addition, he has been a director of two public companies, Canadian Western Bank and The North West Company.  Riley previously served as a director of Molson, Inc. and holds a J.D. from Osgoode Hall Law School, and a B.A. from Queen's University.  The 2019 Proxy lists his skills and qualifications to include (among others): finance expertise and experienced CEO.

40.     Together PH Coors, PJ Coors, Devita, Ferguson-McHugh, Hobbs, AT Molson, GE Molson, Napier, Tough, Vachon, Eaton, Herington and Riley are referred to herein as the "Director Defendants."

**Audit Committee Defendants**

41.     During the Class Period, the members of the Audit Committee were:  Defendants Devita, Eaton (Chair), Herrington, and Hobbs (hereinafter the "Audit Committee Defendants").

**Doe Defendants**

42.     The "Doe" Defendants includes various yet-to-be-identified individuals, officers, executives, corporations, agents and/or other business entities, such as the accountants and auditors of Molson, that participated in the violations alleged herein, and performed acts and/or made statements in furtherance thereof, including by complicit involvement in and/or knowingly aiding in the accounting misstatement and resulting violations of the federal securities laws alleged herein.

43.     The true identities, names and capacities, whether individual, corporate, or otherwise of Defendants Does 1 through 10, inclusive, are presently unknown to Lead Plaintiffs.  Lead Plaintiffs therefore sue Defendants Does 1 through 10 by such fictitious names.

44.     Lead Plaintiffs further allege that each of the said fictitious Doe Defendants is in some manner responsible for the acts and occurrences set forth herein, and that Lead Plaintiffs' damages were caused by such Doe Defendants.  Lead Plaintiffs will seek leave of the Court to amend this Complaint to allege their true names and capacities when such information is ascertained during the course of discovery in this case, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Lead Plaintiffs.

### E.  Oversight and Compliance Duties of the Defendants

45.     According to the 2019 Proxy, the Company's management is charged with "managing the business and the risks associated with the enterprise and reporting regularly" to the Board and is expected to regulate such risk through "robust internal processes and control environments, comprehensive internal and external audit processes, a strong ethics and compliance department and by adhering to the Code of Business Conduct and our other polices."

46.     The 2019 Proxy discusses the Board's role in risk oversight as overseeing an enterprise risk management program "designed to enable [the Board] to appropriately identify, monitor, manage, prioritize and mitigate these risks, and foster a culture of integrity, risk awareness and compliance."  The Board specifically tasked the Audit Committee with oversight of the Company's "internal controls and internal audit function."  *See* 2019 Proxy at 22.

47.     Specifically, the Audit Committee has the obligation to ensure the integrity of the financial reporting process.  More specifically, these responsibilities include oversight over the: (i) integrity of Molson's financial reporting process and Molson's financial statements;  (ii) compliance with legal and regulatory requirements; (iii) systems of internal control over financial reporting and disclosure controls and procedures;  (iv) internal audit function; and (v) qualifications, engagement, compensation, independence and performance of its independent auditors, their conduct of the annual audit and their engagement for any unlawful purposes.

48.     Under its Charter, the Audit Committee Defendants were charged with: (i) providing an avenue of communication among Molson's independent auditors, financial and senior management, internal audit department, ethics and compliance managers and the Board;

and (ii) overseeing the work of Molson's independent auditors, including resolution of disagreements between management and the independent auditors regarding financial reporting.

49.    The Audit Committee is also charged with reviewing the adequacy of the Company's internal controls over financial reporting and disclosure controls.  According to the 2016, 2017, and 2018 Proxy, the Audit Committee Defendants were considered to be independent, "financially literate," and had two "audit committee financial experts" (Eaton and Hobbs).  *See* 2016 Proxy at 33; 2017 Proxy at 36; 2018 Proxy at 34.

50.    Each of the Proxy Statements contained a Report submitted by the Audit Committee.  *See* 2016 Proxy at 92 (submitted by Defendant Eaton as the Chairman, along with Defendants Herington, Hobbs and Napier); 2017 Proxy at 81 (submitted by Defendant Eaton as the Chairman, along with Defendants Herington, Hobbs and DeVita); 2018 Proxy at 76 (submitted by Defendant Eaton as the Chairman, along with Defendants Herington, Hobbs and DeVita).

51.    In addition, each of the Company's 10-Ks during the Class Period provided that: "The Board of Directors, operating through its Audit Committee composed of independent, outside directors, monitors the Company's accounting control systems and reviews the results of the Company's auditing activities. The Audit Committee meets at least quarterly, either separately or jointly, with representatives of management, PricewaterhouseCoopers LLP [("PwC")], and internal auditors. To ensure complete independence, [PwC] and the Company's internal auditors have full and free access to the Audit Committee and may meet with or without the presence of management."  Annual Report (Form 10-K) (Feb. 12, 2019) ("2018 10-K") at 79; Annual Report (Form 10-K) (Feb. 14, 2018) ("2017 10-K") at 79; Annual Report (Form 10-K) (Feb. 14, 2017) ("2016 10-K") at 78.

52.    The 2016 and 2018 10-Ks were signed by all of the Individual Defendants, and the 2017 10-K was signed by each of the Individual Defendants (with the exception of Defendant Riley).  *See* 2016 10-K at 185; 2017 10-K at 185; and 2018 10-K at 184.  In addition, each of the 10-Ks included a Report by Management which was signed by Defendants Hunter and Joubert.

*See* 2016 10-K at 78; 2017 10-K at 79; 2018 10-K at 79.

53.    In the performance of its oversight function, the Board's Audit Committee allegedly reviewed and discussed the audited financial statements in the 2016, 2017 and 2018 Annual Reports with management and PwC.  The Audit Committee purported to discuss with PwC the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, Communication With Audit Committees, and the Public Company Accounting Oversight Board (PCAOB), AU Section 1301, Communications with Audit Committees, and to have the written disclosures and the letter from PwC required by applicable requirements of the PCAOB regarding the independent auditor's communications with the Audit Committee concerning independence.

54.    According to the Audit Committee, based upon the review and discussions, the Audit Committee recommended to the Board that the audited financial statements be included in the 2016, 2017 and 2018 10-Ks.

## The Individual Defendants

55.    The Director Defendants and the Executive Defendants are collectively referred to herein as the "Individual Defendants" and together with Molson as "Defendants."  The Individual Defendants, by virtue of their positions with the Company, possessed the power and authority to control the contents of Molson's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, but not the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations concerning the tax effects of the Acquisition and the state of the Company's internal controls which were being made, were then materially false and misleading.  Each of the Individual

Defendants instead signed the SEC filings and/or certifications pursuant to SOX and is thus liable for the false statements alleged herein at ¶¶ 52, 106, 107, 120, 121, 134, 135, 146, 147, 152, 156, 170, 171, 183, 184, 193, 194, 257, 296, 299, 300, 309, 313, 322, 323, 334.

56.    Many of the Individual Directors held significant stock ownership in the Company. Molson requires that "[i]n order to further align the interests of directors with the long- term interests of our stockholders, our Board has determined that, by end of the his or her fifth year as a director, each director should own stock or stock equivalents with a value equal to five times his or her annual retainer." *See* 2018 Proxy at 37.

57.    According to the 2018 Proxy (at 77), as of March 16, 2018, the Director Defendants had beneficial ownership of the following Molson Class B Common stock:

Directors:

| | |
|---|---|
| Peter H. Coors | 719,392 |
| Peter J. Coors | 48,519 |
| Betty K. DeVita | 736 |
| Roger G. Eaton | 15,099 |
| Mary Lynn Ferguson-McHugh | 0 |
| Charles M. Herington | 24,526 |
| Franklin W. Hobbs | 52,868 |
| Mark R. Hunter | 405,695 |
| Andrew T. Molson | 3,455,926 |
| Geoffrey E. Molson | 16,412 |
| Iain J.G. Napier | 17,361 |
| H. Sanford Riley | 44,881 |
| Douglas D. Tough | 8,203 |
| Louis Vachon | 12,629 |

## IV.    BACKGROUND

### A.    Company

58.    Molson. Inc. and Adolph Coors Company were founded in 1786 and 1873, respectively.  The Company's largest markets are the U.S., Canada and Europe.  In February 2005, Molson, Inc. merged with Adolph Coors Company and changed its name to Molson Coors Brewing Company. On October 30, 2019, the Company announced that it will change its name to Molson Coors Beverage Company in January 2020.

59.    Molson has a diverse portfolio of owned and partner brands, which fall into a wide range of consumer segments in a variety of markets, including core brands Carling, Coors

Light, Molson Canadian, and Staropramen.  Under a license from Heineken, Molson also brews or distributes Amstel Light, Heineken, Murphy's, Newcastle Brown Ale, and Strongbow cider. In January 2015, Molson began selling import brands owned by Heineken, including Desperados, Dos Equis, Moretti, Sol and Tecate.  At of the end of 2015, Molson had approximately 9,100 full-time employees globally, including 6,000 within its Europe segment, 2,400 within its Canada segment, 500 with the Molson Coors International ("MCI") segment and 200 at the Company's headquarters in Colorado.  Additionally, as of December 31, 2015, MillerCoors, Molson's joint venture with SAB Miller, had approximately 8,400 full-time employees of its own.

**B.      Revolving Door of CFOs and Interim CFOs**

60.      From June 2012 to November 2015, Hattersley was Molson's CFO.  *See* 2016 Proxy at 48.  According to the 2016 Proxy, Hattersley was named Interim CEO at MillerCoors, effective July 1, 2015, "while continuing his CFO responsibilities with Molson Coors." *Id.* Effective September 8, 2015, Hattersley became CEO of MillerCoors, "ending his employment with the Company" but "continued to consult with the Company in the CFO capacity until November 16, 2015." *Id.*  From November 2015 to May 2016, David Heede ("Heede") acted as Interim CFO.  *See* 2017 Proxy at 47.  On May 2, 2016, Restrepo was named CFO, at which time Heede returned to his previous position as CFO of Molson Coors Europe.  *Id.* On November 17, 2016, Restrepo resigned his position as CFO due to personal misconduct at the Company.  *See* Current Report (Form 8-K) (Nov. 17, 2016).  On the same day, Molson appointed Joubert, the then current VP and CFO of MillerCoors, to the position of Molson CFO.   In sum, in the span of one year, Molson had four either CFOs or Interim CFOs, including a consultant who advised on the CFO duties.

**C.      DOJ Plea Agreements Re: Accounting Fraud**

61.      Symptomatic of flawed weaknesses in the internal control and compliance processes at MillerCoors, on May 4, 2016, in *USA v. Colletti*, 15-cr-00260 (N.D. Ill.), a former MillerCoors executive pled guilty to bilking MillerCoors out of more than $8 million in costs for

marketing events that were either inflated or never happened at all. David Colletti, who managed accounts for MillerCoors sales at stadiums and venues until 2013, admitted he recruited people to act as vendors on hundreds of false invoices he signed off on and submitted to MillerCoors. Once MillerCoors paid the bills, Colletti would split the payout with the purported vendors, using it to pay for investments, debts and luxury goods. According to Colletti's plea agreement, MillerCoors paid out over $8.6 million based on 200 false bills from 15 different vendors controlled by Colletti's co-defendants.

62.     The ability of a former MillerCoors executive to perpetuate such an extensive criminal fraud over several years is a major red flag as to the flaws and weakness in the internal control and compliance processes at MillerCoors.

## V.     MILLERCOORS:  JOINT VENTURE TO ACQUISITION

### A.     Formation of the Joint Venture

63.     MillerCoors began as a joint venture in July 2008 combining the U.S. and Puerto Rico operations of SABMiller and Molson with Miller Brewing Company ("Miller") and MC Holding Company LLC ("Coors"). Molson and SABMiller were the direct owners (the "Shareholders"). MillerCoors and its subsidiaries brew, market and sell the MillerCoors brand in the U.S. and Puerto Rico. Its major brands include Coors Light, Miller Lite, Keystone, Miller High Life, and Blue Moon. MillerCoors also brews for third parties under contract brewing agreements and operates one distributer owned by MillerCoors.[7]

---

[7]     In the formation of the MillerCoors joint venture, Molson and SABMiller each assigned the U.S. and Puerto Rico ownership rights to its respective legacy brands to MillerCoors, but retained all ownership of these brands outside the U.S. and Puerto Rico. MillerCoors' core domestic brands are Coors Light and Miller Lite. MillerCoors also sells additional domestic beer brands including Coors Banquet, Coors Peak, Hamm's, Keystone Light, Icehouse, Mickey's, Miller 64, Miller Fortune, Miller Genuine Draft, Miller High Life, Milwaukee's Best, Old English 800 and Steel Reserve. Craft and import brands are marketed and sold through Tenth and Blake Beer Company ("Tenth and Blake"). These include the Blue Moon brands, Jacob Leinenkugel Brewing Company brands and, imported under license, Grolsch, Peroni Nastro Azzuro and Pilsner Urquell. MillerCoors' hard cider brands are Crispin and Smith & Forge and its flavored malt beverages include the Henry's hard sodas and Steel Reserve Alloy Series. MillerCoors also brews or distributes under license George Killian's Irish Red and the Redd's brands, as well as certain of the Foster's and Molson brands.

64.     SABMiller and Molson held a 50% voting interest in MillerCoors and a 58% and 42% economic interest, respectively.   SABMiller and Molson agreed that all of their U.S. and Puerto Rico operations would be exclusively conducted through the MillerCoors joint venture starting in July 2008.   So, effective July 1, 2008, Molson's equity investment in MillerCoors was operated as Molson's U.S. operating segment.   The formation of MillerCoors in 2008 created a stronger U.S. presence for Molson with the scale, operational efficiency and distribution platform to compete more effectively in the U.S. marketplace.

65.     MillerCoor's opening balances, as of July 1, 2008, were based on contributions of assets and liabilities from the Shareholders recognized on a carryover basis.   If MillerCoors dissolved, the Shareholders would receive proceeds pro rata in accordance with the Shareholder capital accounts.   For U.S. federal and state income tax purposes, the Shareholders elected to treat MillerCoors as a partnership.   As a result, the related tax attributes of MillerCoors passed through to the Shareholders and income tax was payable by the Shareholders.   During fiscal year 2015, Molson accounted for its interest in MillerCoors under the equity method of accounting. *See* 2015 10-K at 8.

**B.     Molson's U.S. Operating Segment - MillerCoors**

66.     MillerCoors is the second largest brewer by volume in the U.S., selling approximately 26% of the total 2015 U.S. brewing industry shipments (excluding exports).   In the U.S., beer is generally distributed through a three-tier system consisting of manufacturers, distributors and retailers.   A national network of approximately 425 independent distributors purchases MillerCoors' products and distributes them to retail accounts.   In 2015, approximately 17% of MillerCoors' beer volume was sold on-premise in bars and restaurants, and the other 83% was sold off-premise in convenience stores, grocery stores, liquor stores and other retail outlets.   MillerCoors wholly owns one distributorship (less than 1% of its total volume in 2015).

67.     MillerCoors operates ten breweries, two container operations and one cidery, which produce MillerCoors' products.   In Q3 2015, MillerCoors announced the planned closure of the Eden, North Carolina brewery, which closed in Q3 2016.   As a result of the planned

brewery closure, MillerCoors recognized $67.7 million of charges during the second half of 2015 as special items, of which $61.3 million related to accelerated depreciation of brewery assets. MillerCoors estimated that total special charges associated with the planned Eden closure were expected to be approximately $150 million to $200 million, consisting primarily of accelerated depreciation and asset write-offs.

### C.   MillerCoors:  Shared Officers and Directors with Molson

68.     Prior to becoming Molson's CFO, Joubert served as the CFO and Executive VP of MillerCoors (2012 to 2016).  As of February 2016, Molson and MillerCoors shared certain executive officers and directors:

| Name | Position |
| --- | --- |
| Peter H. Coors | Vice Chairman of the Board of Molson, Chairman of Coors Brewing Company and Chairman of the Board of MillerCoors |
| Mark Hunter | President and CEO of Molson and a Director of MillerCoors |
| David Heede | Interim CFO of Molson and a Director of MillerCoors |
| Samuel Walker[8] | Chief People and Legal Officer of Molson and a Director of MillerCoors |
| Celso White[9] | Chief Supply Chain Officer of Molson and a Director of MillerCoors |

69.     Prior to the 100% Acquisition of MillerCoors by Molson.  Molson jointly controlled MillerCoors with SABMiller and directed the MillerCoors business through its equal representation on its Board (along with SABMiller), ongoing communication and oversight.  MillerCoors' management, which included Joubert in 2015 and 2016, was responsible for the day-to-day operation of the business.

### D.   Acquisition Announced

70.     On November 11, 2015, Anheuser-Busch InBev SA/NV ("ABI") announced it had entered into an agreement to acquire SABMiller.  The resulting transaction ("ABI/SABMiller transaction") was subject to ABI and SABMiller shareholder and various global regulatory approvals.  Concurrently with this transaction, on November 11, 2015, Molson

---

[8]     On January 31, 2018, Samuel Walker gave notice that he would retire from his position effective February 28, 2018.

[9]     On October 30, 2019, the Company announced that White would retire, effective as of November 30, 2019.

entered into a purchase agreement (the "Purchase Agreement") with ABI to acquire, contingent upon the closing of the ABI/SABMiller transaction, all of SABMiller's 58% economic interest and 50% voting interest in MillerCoors and all trademarks, contracts and other assets primarily related to the Miller brand portfolio outside of the U.S. and Puerto Rico for $12.0 billion in cash, subject to downward adjustment as described in the Purchase Agreement (the "Acquisition").

71.     According to the 2015 10-K (at 35), consolidating control of MillerCoors "will further improve [Molson's] scale and agility, [and the Company will] benefit from significantly enhanced cash flows, and capture substantial operational synergies." The additional purchase of the Miller brand trademarks outside of the U.S. and Puerto Rico "provides a strategic opportunity to leverage the iconic *Miller* trademark globally" as well as "volume and profit growth opportunities" in both core and emerging markets. *Id.* The Acquisition was to be funded through cash on hand and financed through a combination of debt and equity security issuances.[10] Molson planned to treat the Acquisition as an asset acquisition for U.S. tax purposes and expected "to receive substantial cash tax benefits for the first 15 years after completion." *Id.*

### E.     MillerCoors 2015 Financial Results

72.     As part of the Q4 2015 Molson Earnings Call held with market analysts on February 11, 2016 ("Q4 2015 Earnings Call"), both Hunter and interim CFO Heede reviewed Molson's "Financial Headlines." Molson's overall financial performance headlines for 2015 showed weakness with "$770.4 million of underlying after-tax income, or $3.76 per diluted share." TAP Q4 2015 (Thomson Reuters) Tr. at 4. "Underlying after-tax income declined 9%

---

[10]     On July 7, 2016, Molson issued Notes (which resulted in proceeds of $6.9 billion) in order to partially fund the financing of the Acquisition ("2016 Notes"). The 2016 Notes began accruing interest upon issuance, with semi-annual payments due on the USD Notes and CAD Notes in January and July beginning in 2017, and annual payments on the EUR Notes beginning July 2017. In conjunction with the Acquisition, Molson entered into a term loan commitment of up to $1.5 billion in a 3-year tranche and up to $1.5 billion in a 5-year tranche, for an aggregate principal amount of up to $3.0 billion. On October 11, 2016, in connection with the closing of the Acquisition, Molson borrowed $1.0 billion under the 3-year tranche and $1.5 billion under the 5-year tranche, for an aggregate principal amount of $2.5 billion. The net proceeds received from the term loan as well as the issuance of the 2016 Notes and February 3, 2016, equity offering were sufficient to fund the purchase price of the Acquisition of $12 billion.

from a year ago." *Id.*  As to the regional highlights for 2015, in the U.S. Segment (MillerCoors), pre-tax earnings in 2015 were unchanged.  *Id.*

73.     In its 2015 10-K, Molson reported that its 2015 equity income in MillerCoors decreased 8.1% to $516.3 million, driven by special charges recognized in 2015 related to the decision to close the Eden brewery, as well as the early settlement of a portion of MillerCoors' defined benefit pension plan liability.  2015 10-K at 36.

74.     As of December 31, 2015, Molson's proportionate share of MillerCoors' net income was reported under the equity method as follows:

| | As of | |
| --- | --- | --- |
| | December 31, 2015 | December 31, 2014 |
| | (In millions, except percentages) | |
| MillerCoors owners' equity | $       7,292.8 | $       7,179.1 |
| MCBC economic interest | 42% | 42% |
| MCBC proportionate share in MillerCoors' equity | 3,063.0 | 3,015.2 |
| Difference between MCBC contributed cost basis and proportionate share of the underlying equity in net assets of MillerCoors[1] | (657.0) | (661.6) |
| Accounting policy elections | 35.0 | 35.0 |
| Investment in MillerCoors | $       2,441.0 | $       2,388.6 |

*See* 2015 10-K at 94.

**F.      Critical Importance of the Acquisition**

75.     At the Q4 2015 Molson Earnings Call, Hunter started the call by stating:  ***"[t]he most important strategic development for [Molson] in 2015*** was a definitive agreement we reached late in the year to purchase a 58% [interest in] MillerCoors that we do not currently own, along with the international rights to the Miller brands.  ***This is a game-changing transaction for our Company*** that's compelling both financially and strategically."  TAP Q4 2015 (Thomson Reuters) Tr. at 3.[11]  Hunter reiterated the exact same message at the end of this call.  *Id.* at 7.

76.     In responding to questions from analysts at the Q4 2015 Earnings Call, Hunter stated: "if you look at the MillerCoors transaction, assuming that goes ahead, as anticipated, then if you take the long range plans for each individual segment, each of the business units, if you

---

[11]     Emphasis added throughout unless otherwise indicated as original.

layer on top of that $200 million of synergies and then the cash tax benefits, it's clearly both strategically and financially compelling and will deliver strong return[s] for our shareholders. Anything we can do to either increase that synergy number or get the synergy numbers faster will make a great deal . . . .  So that's the work we're on at this point in time."  TAP Q4 2015 (Thomson Reuters) Tr. at 14-15.

**Q1 2016 Earnings Announcements**

77.     At the Q1 2016 Molson Earnings Call held with market analysts on May 3, 2016 ("Q1 2016 Earnings Call"), Hunter gave an update on the Acquisition:

> And we made solid progress in our planning for the integration of MillerCoors and the Miller global brand portfolio. ***Completion of this game-changing transaction is still expected in the second half of this year and we intend to be ready to go on day one following the close.***

TAP Q1 2016 (FactSet CallStreet) Tr. at 4.

78.     At the beginning of the Q1 2016 Earnings call, Hunter noted some initial and positive topline financial highlights which included "increased total company underlying after-tax earnings [of] more than 28%," and, for the U.S. segment, "underlying equity income increased 22.1%."  TAP Q1 2016 (FactSet CallStreet) Tr. at 4.  Almost no other 'financial highlights' were provided by Hunter.  *Id.* at 3-5.  In responding to questions from analysts at the Q1 2016 Earnings Call, Hunter stated: "we've got to deliver our 2016 plan, make sure that we are delivering both top-line, bottom-line and the strong cash performance and be prepared to go when the deal is approved . . . . It's really no more complicated than that."  *Id.* at 12.  The market was well aware of the critical nature of the $12 billion Acquisition with one analyst remarking that "MillerCoors, the U.S. market is going to be about 80% of your earnings." *Id.* at 15.

79.     On May 3, 2016, Molson also posted on BUSINESS WIRE its First Quarter 2016 Results entitled, "Molson Coors Reports Higher Worldwide Volume, Gross Margin, Net Income and Underlying After-Tax Income for the First Quarter" ("Q1 2016 Earnings Release").    The first line of the Q1 2016 Earnings Release states that Molson "today reported a 28.1 percent increase in underlying after-tax income for the first quarter of 2016, driven by worldwide volume growth and lower cost of goods sold."   The Company reported that these factors "more than

offset negative sales mix, higher brand spending globally, and a higher underlying tax rate." Hunter was quoted, in pertinent part, as follows: "we made solid progress in our planning for the integration of MillerCoors and the Miller global brand portfolio."

80.     According to the Q1 2016 Earnings Release, as of March 31, 2016, deferred tax liabilities were $796.1 million, down slightly from the prior quarter ($799.8M) and unrecognized tax benefits were $12.4 million, up from the prior quarter ($8.4M).

**Q2 2016 Earnings Announcements**

81.     At the Q2 2016 Molson Earnings Call held on August 2, 2016 ("Q2 2016 Earnings Call"),  Hunter provided an update on the Acquisition as follows:

> In the past few months, *we've also made substantial progress on the pending MillerCoors transaction, including in integration planning* and completing the necessary financing at very attractive rates.  Investor demand for our recent debt offering was very strong, and we achieved record and near-record low interest rates on our debt issue.  We're pleased with the transaction progress made-to-date, and we continue to plan for a closing before the end of 2016.  More specifically, October the 10, based on the joint ABI/SAB recent announcements.
>
> We're very excited to be much closer *to completing this game-changing transaction*, which will enable simplified decision making and will reduce the complexities of dual ownership[.]  [I]t will help us to become a more integrated and efficient brewer[,] and it will enable us to become a more effective competitor as a single owner, promoting consumer choice in an increasingly diverse and fast-growing brewing industry.
>
> As part of [the] integration planning process, last week, I announced some *leadership appointments that will strengthen our combined organization* and that will take effect upon the close of the transaction.

TAP Q2 2016 (FactSet CallStreet) Tr. at 3-4.

82.     On the Q2 2016 Earnings Call, the new CFO (Restrepo) provided the "Financial Highlights" for the first time.  The results were consistently lower than the year prior with pre-tax income down 32.1% and after tax income from continuing operations down 24.1% from the prior year result.  TAP Q2 2016 (FactSet CallStreet) Tr. at 6.

83.     On August 2, 2016, Molson posted on BUSINESS WIRE its Second Quarter 2016 Results entitled, "Molson Coors Reports Second Quarter Results" ("Q2 2016 Earnings

Release").  On the second line, the report stated "[t]he Company also reported a 9.2 percent decrease in underlying after-tax income for the second quarter [of] 2016."

84.     In the Q2 2016 Earnings Release, Hunter reiterated that: "We are very excited to be much closer to completing *this game-changing transaction*, which will allow us to simplify decision-making and *reduce the complexities of dual ownership*.

G.      **Acquisition Completed**

85.     On October 11, 2016, Molson completed the Acquisition of SABMiller's 58% economic interest and 50% voting interest in MillerCoors, resulting in its owning 100% of the outstanding equity and voting interest of MillerCoors.   Following the completion of the Acquisition, as a wholly owned subsidiary, *MillerCoors and Molson's results were fully consolidated beginning on October 11, 2016.*   Prior to the consolidation, Molson operated through the following segments: the U.S. (as MillerCoors), Canada, Europe and MCI.  A separate operating team managed each segment and each segment manufactures, markets, and sells beer and other beverage products.  As result of the Acquisition, effective January 1, 2017, various European markets including Sweden, Spain, Germany, Ukraine and Russia, which formerly reported under Molson's MCI segment, moved to reporting within the Europe segment.  Effective January 1, 2017, the MillerCoors Puerto Rico business, formerly reported as part of the U.S. segment, reported its results within the MCI segment.

**Q3 2016 Earnings Announcements**

86.     On the Q3 2016 Molson Earnings Call ("Q3 2016 Earnings Call") held on November 1, 2016, Hunter advised analysts that "we will take you through our third quarter 2016 results to, in essence, close [Molson] as it has been structured for the past several years" and then "turn our attention to our recently completed MillerCoors transaction and three new or updated financial reporting metrics, along with some perspective for the fourth quarter."  TAP Q3 2016 (FactSet CallStreet) Tr. at 3.  Although Hunter noted that overall sales to retail volume decreased by 4% for the third quarter and 2.5% for the year to date, the bottom line highlights for

the U.S. Segment were "underlying equity income increased 9% in the third quarter, driven primarily by the lower cost of goods sold, higher net pricing and positive sales mix." *Id.* at 4.

87.     On the Q3 2016 Earnings Call, the CFO (Restrepo) introduced "new performance metrics" once the Acquisition closed.  According to Restrepo, the first new performance metric was called "transaction adjusted EPS" and described as a "new non-GAAP performance measure" designed "to provide enhanced visibility to the performance and value" of Molson post-Acquisition.  TAP Q3 2016 (FactSet CallStreet) Tr. at 6.  To calculate this "new measure", the Company starts "with underlying book EPS, a non-GAAP measure, and then add[s] back after-tax book amortization" that is directly related to the Acquisition, and "***then add[s] the transaction-related cash tax benefits***." *Id.* at 7.  Based on this calculation, the latest *pro forma* financial statements posted to the Company's website, showed a 2015 *pro forma* transaction adjusted EPS of $6.11 per diluted share (which includes Acquisition-related, after tax book amortization of $42 million and cash tax benefits of $275 million per year).  *Id.*  As a result, for the first three quarters of 2016, pro forma transaction-adjusted EPS was $5.43 per diluted share, an increase of 4% versus $5.22 per diluted share for the first three quarters of 2015.  *Id.*

88.     In discussing the Acquisition on the Q3 2016 Earnings Call, Hunter stated: "This clearly is a historic time in the evolution" of Molson.  TAP Q3 2016 (FactSet CallStreet) Tr. at 8.  Hunter identified the tax benefits as follows:

> Because this is an asset transaction for U.S. tax purposes, we will receive immediate cash tax benefits that we now estimate will exceed $275 million annually for the next 15 years.  This represents an increase from our previous estimate of more than $250 million per year, ***due to the detailed tax diligence work that we've completed during the past year***.

*Id.*

89.     In concluding his remarks on the just completed Acquisition, Hunter noted that "this transformation of our company offers unique opportunities for us to drive cash generation through substantial tax benefits, cost synergies, cross border working capital improvements, and disciplined use of our PACC model across the combined company."  TAP Q3 2016 (FactSet CallStreet) Tr. at 10.  However, market analysts began to question how the transaction adjusted

EPS increased to $6.11 versus the $5.72 provided at the September conference call.  *Id.* at 15 ("can you bridge from $5.72 to $6.11, what's gone up in that adjustment?"), 19 (cash flow view more than $1 below, "implies some pretty significant CapEx or something else was going on in [the] transaction-adjusted EPS," "I don't know if you have response to that").

90.     On November 1, 2016, Molson posted its Third Quarter Results on BUSINESS WIRE ("Q3 2016 Earnings Release").  In its Q3 2016 Condensed Consolidated Balance Sheet, Molson reported deferred tax assets of $26.7 million, up from $20.2 million as of December 31, 2015 and deferred tax liabilities of $798.1 million, down slightly from December 31, 2015 ($799.8 million).

91.     Almost immediately after Molson completed the Acquisition and reported its results for Q3 2016, its 'new CFO', Restrepo abruptly resigned his position due to personal misconduct.   On November 17, 2016, Molson appointed Joubert (formerly the CFO at MillerCoors) as the new Molson CFO.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     Post-Acquisition Results – Q4 2016 and FY 2016

92.     The Class Period begins on February 14, 2017, when the Company filed the 2016 10-K, held its Q4 2016 Molson Earnings Call ("Q4 2016 Earnings Call"), and published on BUSINESS WIRE its results for Q4 2016 and FY 2016  entitled "*Molson Coors Reports 2016 Fourth Quarter and Full Year Results*" ("Q4 2016 Earnings Release").

**Q4 2016 Earnings Call**

93.     Hunter, along with the new Molson CFO, Joubert, opened the Q4 2016 Earnings Call, by stating "the biggest news for 2016" was completing the Acquisition for $12 billion, "representing the largest transaction" in Molson's history.  TAP Q4 2016 (Bloomberg) Tr. at 2. Hunter stated that the "completion of the MillerCoors transaction represents a step forward in the size and strength of our business, and this will drive some significant changes in our financial numbers in the near term as we align and enhance our financial reporting."  *Id.* at 3.

94.     On the Q4 2016 Earnings Call, Hunter stated that "in order to provide more

comparable financial information, unless otherwise indicated, all fourth quarter and full year 2016 consolidated and U.S. results discussed . . . will be presented on a *pro forma* basis, as if the MillerCoors transaction and its financing had been completed at the beginning of 2015." TAP Q4 2016 (Bloomberg) Tr. at 3. "On an underlying pro forma basis, [Molson] grew pre-tax income 4.1% and after tax income 1.9% for the year." *Id.*

95.     On the Q4 2016 Earnings Call, Joubert reported financial highlights for the first time. Joubert echoed Hunter's comments that they were providing "*pro forma* results for the consolidated company and U.S. business" and "including **updates from refinements to purchase accounting and related tax assumptions** and aligning the way we report our volume." TAP Q4 2016 (Bloomberg) Tr. at 4. Joubert noted that on the last earnings call that analysts were provided with "transaction adjusted earnings per share which is how [Defendants] look at value creation from the MillerCoors and Miller global brands transaction." *Id.* at 5. However, "since the SEC has provided general direction to the market, reinforcing a bias against non-GAAP measures," the Company would provide the components so analysts could do "that calculation on [their] own." *Id.* Joubert suggested that analysts could add the three numbers (**$98.7 after tax earnings** plus $9.4 million transaction related after tax book amortization and $63.9 million transaction related cash tax benefit) and then divide by the 216.4 million diluted shares outstanding.

## Q4 2016 Earnings Release

96.     In the Q4 2016 Earnings Release, Footnote 1 to the Financials stated that "our *pro forma* financial information, **revised as of February 14, 2017**, has been updated from the version previously provided on November 1, 2016" and "[t]he changes from the previously provided version **reflect significant refinements** to purchase accounting, with primary changes due to non-cash adjustments to depreciation and amortization, pension expense and **the related tax impacts**."

**Molson's 2016 10-K**

97.     For the year ended December 31, 2016 ("FY 2016"), in the 2016 10-K, Molson's consolidated statement of operations included MillerCoors' results from January 1, 2016, to October 10, 2016, on an equity method basis of accounting and from October 11, 2016, to December 31, 2016, on a consolidated basis of accounting. So, prior to October 11, 2016, Molson's 42% share of MillerCoors' results of operations was reported as equity income and its 42% share of MillerCoors' net assets were reported as Investment in MillerCoors as an asset on its balance sheets.  According to the 2016 10-K (at 35), Molson's consolidated balance sheet as of December 31, 2016 "include[d] [the] acquired assets and liabilities, which were recorded at their respective acquisition-date fair values upon completion of the Acquisition."  MillerCoors represented 68% of the total consolidated assets and 32% of Molson's consolidated net sales for year ended December 31, 2016.

**Assets Held**

98.     According to the 2016 10-K (at 104), the following table summarizes the estimated preliminary fair values of the assets acquired and liabilities assumed at the Acquisition date (in millions):

| | |
|---|---|
| Total current assets | $1,063.4 |
| Property, plant and equipment | 3,002.0 |
| Other intangible assets | 9,875.0 |
| Other assets | 330.6 |
| Total current liabilities | (1,154.3) |
| Pension and postretirement benefits | (1,009.7) |
| Other non-current liabilities | (209.2) |
| Total identifiable net assets acquired | $11,897.8 |
| Goodwill | 6,415.6 |
| Fair value of noncontrolling interests | (185.0) |
| Total consideration and value to be allocated to net assets | $18,128.4 |

99.     The 2016 10-K (at 34) provided "Selected Financial Data" as follows:

| | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| | (In millions, except per share data) | | | | |
| Consolidated Statements of Operations: | | | | | |
| Net sales | $    4,885.0 | $    3,567.5 | $    4,146.3 | $    4,206.1 | $    3,916.5 |

| Net income from continuing operations attributable to MCBC[12] | $ | 1,978.7 | $ | 355.6 | $ | 513.5 | $ | 565.3 | $ | 441.5 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income from continuing operations attributable to MCBC per share: | | | | | | | | | | |
| Basic | $ | 9.33 | $ | 1.92 | $ | 2.78 | $ | 3.09 | $ | 2.44 |
| Diluted | $ | 9.27 | $ | 1.91 | $ | 2.76 | $ | 3.07 | $ | 2.43 |

According to the relevant footnote, this selected financial data for 2016 included MillerCoors' results of operation on a consolidated basis for the Post-Acquisition period of October 11, 2016 through December 31, 2016.

　　　100.　The 2016 10-K (at 80) contained the following excerpts from the Consolidated Statements of Operations:

| (IN MILLIONS EXCEPT FOR PER DATA SHARE) | | |
|---|---|---|
| | | For the Year Ended |
| | | December 31, 2016 |
| Income tax benefit (expense) | | (1,050.7) |
| Net income (loss) from continuing operations | | 1,984.6 |
| Income (loss) from discontinued operations, net of tax | | (2.8) |
| Net income (loss) including noncontrolling interests | | 1,981.8 |
| Net (income) loss attributable to noncontrolling interests | | (5.9) |
| Net income (loss) attributable to Molson Coors Brewing Company | $ | 1,975.9 |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share: | | |
| From continuing operations | $ | 9.33 |
| From discontinued operations | | (0.01) |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share | $ | 9.32 |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share: | | |
| From continuing operations | $ | 9.27 |
| From discontinued operations | | (0.01) |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share | $ | 9.26 |
| Weighted-average shares—basic | | 212.0 |
| Weighted-average shares—diluted | | 213.4 |
| Amounts attributable to Molson Coors Brewing Company | | |
| Net income (loss) from continuing operations | $ | 1,978.7 |
| Income (loss) from discontinued operations, net of tax | | (2.8) |

---

[12]　　　Highlighting added for emphasis throughout unless otherwise indicated.

| | | |
|---|---|---|
| Net income (loss) attributable to Molson Coors Brewing Company | $ | 1,975.9 |

101.    The 2016 10-K (at 81) also provided a Consolidated Statement of Comprehensive Income as follows:

### (IN MILLIONS)

| | For the Years Ended | | |
|---|---|---|---|
| | December 31, 2016 | December 31, 2015 | December 31, 2014 |
| Net income (loss) including noncontrolling interests | $   1,981.8 | $   362.8 | $   517.8 |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustments | (234.4) | (918.4) | (849.8) |
| Unrealized gain (loss) on derivative instruments | 9.7 | 20.9 | 7.0 |
| Reclassification of derivative (gain) loss to income | (3.0) | (5.4) | 2.3 |
| Pension and other postretirement benefit adjustments | 62.3 | 33.6 | (136.8) |
| Amortization of net prior service (benefit) cost and net actuarial (gain) loss to income | 31.4 | 37.5 | 26.2 |
| Reclassification of historical share of MillerCoors' AOCI loss | 258.2 | — | — |
| Ownership share of unconsolidated subsidiaries' other comprehensive income (loss) | 22.3 | 34.3 | (102.2) |
| Total other comprehensive income (loss), net of tax | 146.5 | (797.5) | (1,053.3) |
| Comprehensive income (loss) | 2,128.3 | (434.7) | (535.5) |
| Comprehensive (income) loss attributable to noncontrolling interests | (3.0) | (2.3) | (3.8) |
| Comprehensive income (loss) attributable to Molson Coors Brewing Company | $   2,125.3 | $   (437.0) | $   (539.3) |

102.    The 2016-K (at 83) also provided a 2016 Consolidated Balance Sheet as follows:

### (IN MILLIONS, EXCEPT PAR VALUE)

| | As of | |
|---|---|---|
| | December 31, 2016 | December 31, 2015 |
| Liabilities and equity | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities (includes affiliate payable amounts of $2.1 and $10.6, respectively) | $   2,467.7 | $   1,184.4 |
| Current portion of long-term debt and short-term borrowings | 684.8 | 28.7 |
| Discontinued operations | 5.0 | 4.1 |
| Total current liabilities | 3,157.5 | 1,217.2 |
| Long-term debt | 11,387.7 | 2,908.7 |
| Pension and postretirement benefits | 1,196.0 | 201.9 |
| Deferred tax liabilities | 1,699.0 | 799.8 |
| Other liabilities | 267.0 | 75.3 |
| Discontinued operations | 12.6 | 10.3 |

| | | |
|---|---|---|
| Total liabilities | 17,719.8 | 5,213.2 |
| | | |
| ************************************** | | |
| Retained earnings | 6,119.0 | 4,496.0 |
| Accumulated other comprehensive income (loss) | (1,545.5) | (1,694.9 |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) | (471.4 |
| Total Molson Coors Brewing Company stockholders' equity | 11,418.7 | 7,043.0 |
| Noncontrolling interests | 203.0 | 20.1 |
| Total equity | 11,621.7 | 7,063.1 |
| Total liabilities and equity | $ 29,341.5 | $ 12,276.3 |

## Accounting for Deferred Taxes

103. According to the 2016 10-K (at 112), the increase in income tax expense for 2016 versus 2015 was driven by the income tax effects of the pretax gain recognized on the fair value measurement of the MillerCoors equity interest and the reclassification of the accumulated other comprehensive loss *which resulted in the recognition of net deferred income tax expense of approximately $850 million upon completion of the Acquisition*. The assets and liabilities acquired in connection with the acquisition relating to the 58% ownership by MillerCoors was stepped up to fair value for tax purposes (step acquisition), and as a result the carrying value of these assets and liabilities related to the purchase the 58% interest equaled the tax basis as of the acquisition date. 2016 10-K at 101. Also, during the fourth quarter of 2016, Molson Coors recorded deferred income taxes in the approximate amount of $1.1 billion in connection with a revaluation gain of approximately $2.7 billion during the fourth quarter of 2016. The revaluation gain represented the excess of approximately $6.1 billion estimated fair value of the 42% equity interest over the carrying value of its investment of approximately $2.7 billion. In other words, the Company remeasured its pre-existing 42% equity interest in MillerCoors to fair value after the acquisition. 2016 10-K at 102-03.

## No Changes in Internal Control over Financial Reporting

104. Molson reported (2016 10-K at 172) that there were "*no changes in our internal control over financial reporting* (as defined in Exchange Act Rule 13a-15(f)) *during the quarter*

*ended December 31, 2016, that have materially affected, or are reasonably likely to materially*

*affect, our internal control over financial reporting*."

**Management Disclosure Controls**

     105.    In the 2016 10-K, Management disclosed in Item 9A its evaluation of Disclosure

Controls and Procedures as follows:

> *[O]ur Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2016, to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.* Management necessarily applies its judgment in assessing the costs and benefits of such controls and procedures that, by their nature, can only provide reasonable assurance regarding management's control objectives. Also, we have investments in certain unconsolidated entities that we do not control or manage.

2016 10-K at 171.

     106.    Hunter and Joubert each signed the 2016 10-K and represented that the

Company's disclosure controls and procedures were effective as required by Section 404 of the

SOX.  2016 10-K at 78.  Hunter, as President, CEO and Director, signed the 2016 10-K under

the requirements of Section 13 or 15(d) of the Exchange Act, followed by Joubert's signature as

CFO.  2016 10-K at 185.

     107.    The Director Defendants also signed the 2016 10-K, pursuant to the requirements

of the Exchange Act, which included statements that "*[t]here were no changes in our internal*

*control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the*

*quarter ended December 31, 2016 that have materially affected, or are reasonably likely to*

*materially affect, our internal control over financial reporting*" and that "[w]e have

*commenced the process of incorporating and aligning the internal control over financial*

*reporting of MillerCoors LLC* into our internal control over financial reporting framework."

2016 10-K at 172, 185.

**B.**     **Reasons Why Defendants' Statements Regarding Its 2016 Results Were False and Misleading**

108.    The above highlighted statements identified in ¶¶ 93-107 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)     Defendants admitted that they understated the Company's income tax expense, and *overstated net and comprehensive income* as follows:

| | | | Year Ended December 31, 2016 | | |
| --- | --- | --- | --- | --- | --- |
| | | | As Reported | | As Restated |
| | | | (In millions) | | |
| Consolidated Statements of Operations: | | | | | |
| Income tax benefit (expense) | | $ | (1,055.2) | $ | (1,454.3) |
| Net income (loss) | | $ | 1,998.9 | $ | 1,599.8 |
| Net income (loss) attributable to Molson Coors Brewing Company | | $ | 1,993.0 | $ | 1,593.9 |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share | | $ | 9.40 | $ | 7.52 |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share | | $ | 9.34 | $ | 7.47 |
| | | | Year Ended December 31, 2016 | | |
| | | | As Reported | | As Restated |
| | | | (In millions) | | |
| Consolidated Statements of Comprehensive Income: | | | | | |
| Net income (loss) including noncontrolling interests | | $ | 1,998.9 | $ | 1,599.8 |
| Comprehensive income (loss) | | $ | 2,128.3 | $ | 1,729.2 |
| Comprehensive income (loss) attributable to Molson Coors Brewing Company | | $ | 2,125.3 | $ | 1,726.2 |

(b)     Defendants admitted that they *understated the Company's deferred tax liabilities and total liabilities*, which meant that *retained earnings and total shareholder equity was overstated* as follows:

| | | | As of December 31, 2016 | | |
| --- | --- | --- | --- | --- | --- |
| | | | As Reported | | As Restated |
| | | | (In millions) | | |
| Consolidated Balance Sheets: | | | | | |
| Deferred tax liabilities | | $ | 1,699.0 | $ | 2,098.1 |
| Total liabilities | | $ | 17,719.8 | $ | 18,118.9 |

| | | | | |
|---|---|---|---|---|
| Retained earnings | $ | 6,145.3 | $ | 5,746.2 |
| Total Molson Coors Brewing Company stockholders' equity | $ | 11,418.7 | $ | 11,019.6 |
| Total equity | | 1,621.7 | | 1,222.6 |

(c)     Defendants also admitted that ***net income was overstated*** and ***its income tax expense was understated*** in its 2016 Consolidated Cash Flow Statement as follows:

| | | Year Ended December 31, 2016 | | |
|---|---|---|---|---|
| | | As Reported | | As Restated |
| | | (In millions) | | |
| Consolidated Statements of Cash Flows: | | | | |
| Net income (loss) including noncontrolling interests | $ | 1,998.9 | $ | 1,599.8 |
| Income tax (benefit) expense | $ | 1,055.2 | $ | 1,454.3 |

(d)     Molson's understatement of income tax expense and overstatement of net income permitted the Defendants to increase the book value of the Acquisition and falsely inflate its impact on Molson's consolidated statement of operations ***by as much as 37%*** as follows:

**Fiscal Year 2016 Consolidated Statement of Operations
(in millions)**

| | **As Reported** | **As Restated** | **% Change** |
|---|---|---|---|
| **Income tax benefit (expense)** | $ (1,055.2) | $ (1,454.3) | **(37.82%)** |
| **Net income (loss)** | $1,998.9 | $1,599.8 | **(19.97%)** |
| **Net income (loss) attributable to MCBC** | $1,993.0 | $1,593.9 | **(20.03%)** |
| **Basic net income (loss) attributable to MCBC per share** | $9.40 | $7.52 | **(20.00%)** |
| **Diluted net income (loss) attributable to MCBC per share** | $9.34 | $7.47 | **(20.02%)** |

- 38 -

(e)     Defendants also understated its deferred tax liabilities by $339.1 million, *an error of over 23%*:

**Fiscal Year 2016 Consolidated Balance Sheet Misstatements**
**(in millions)**

|  | **As Reported** | **As Restated** | **Percentage Change** |
|---|---|---|---|
| **Deferred tax liabilities** | $1,699.0 | $2,098.1 | **23.5%** |
| **Total liabilities** | $17,719.8 | $18,118.9 | **2.25%** |
| **Retained earnings** | $6,145.3 | $5,746.2 | **(6.5%)** |
| **Total Molson Coors Brewing Company stockholders' equity** | $11,418.7 | $11,019.6 | **(3.5%)** |
| **Total equity** | $11,621.7 | $11,222.6 | **(3.43%)** |

(f)     Defendants falsely claimed to have properly valued MillerCoor's assets and liabilities as a result of the Acquisition and omitted to disclose the materially misstated financial statements (described above), along with the material weaknesses in financial reporting (resulting in a failure to properly calculate net income, tax expense and tax liabilities);

(g)     Defendants falsely certified that Molson's had adequate internal controls and;

(h)     Defendants falsely attested that the financial statements do not contain any untrue statement of material facts and had disclosed any fraud involving management or any employee or involving internal control over financial reporting.

### C.     False and Misleading Statements – Q1 2017 Results

109.    On May 3, 2017, the Company filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2017 (Quarterly Report (Form 10-Q)(May 3, 2017)) ("Q1 2017 10-Q"), held its Q1 2017 Earnings Call ("Q1 2017 Earnings Call"), and published on BUSINESS WIRE its Q1 2017 results entitled: "Molson Coors Reports 2017 First Quarter Results" ("Q1 2017 Earnings Release").

**Q1 2017 Earnings Call**

110.    On the Q1 2017 Earnings Call, Hunter noted in the business highlights that Molson "delivered transaction related cash tax benefits of $97 million in the quarter, more than 40% higher than our original planning expectation" from the Acquisition.   He also noted that the Company expects that "these cash tax benefits for [the] full year 2017 to be nearly $390 million, up from [the] $275 million previously," which he described as "an acceleration" of these benefits.   TAP Q1 2017 (Bloomberg) Tr. at 2.

111.    In the CFO's presentation of Molson's results on the Q1 2017 Earnings Call, Joubert reminded analysts, "We had said . . . last year that we look at value created from the MillerCoors and Miller global brand's transaction through the lens of the sum of three numbers[:] *[u]nderlying after tax earnings per share*, transaction related cash tax benefits, and transaction related after-tax book amortization."   TAP Q1 2017 (Bloomberg) Tr. at 4-5.   Joubert then provided those numbers as follows: after tax earnings of $165 million, plus $97 million of transaction related cash tax benefits and $11.2 million of transaction related after tax book amortization with 216.5 million diluted shares outstanding.   *Id.* at 5.

112.    In looking at the full first quarter since the Acquisition closed, an analyst from Goldman Sachs noted that "investors have been waiting to see the progress that you're making on cost saves and margin progression and certainly we didn't see that in the quarter."   TAP Q1 2017 (Bloomberg) Tr. at 9.   In response, Hunter noted that the members of the executive team "remain confident on our full year plan" and "my perspective is, ***we're making very, very, good progress on integration of our businesses both culturally and operationally***."   *Id.*

113.    Analysts also questioned the break out and size of the "cash tax expectation" associated with the Acquisition.   An analyst from Societe Generale (Andrew Holland) asked for "any insight as to how you are looking at [the] transaction tax question, and whether there is any likelihood, ***that you're going to include that in your sort of normal tax charge***?"   TAP Q1 2017 (Bloomberg) Tr. at 13.   In a follow up question, Holland stated that he was "puzzled" by the calculation and timing of the tax benefit which differed from his model and that "most investors

are interested in the sort of shorter term" because it is a "*very considerable swing factor in your likely reported earnings*." *Id.* at 14. He also expressed concern "that some of your competitors who have also had sort of time-delineated tax benefits have just taken that as part of the normal tax charge rather than as effectively and as exceptional item." *Id.* Hunter responded that the executives would "*ponder that perspective and feedback*" and "*decide whether there is anything we would want to do differently*." *Id.*

**SEC Filings: Q1 2017 10-Q**

114. The Q1 2017 10-Q, signed by VP and Controller Brian C. Tabolt ("Tabolt")[13] as Chief Accounting Officer on May 3, 2017 (*id.* at 68), provided in pertinent part, the following Consolidated Balance Sheet:

MOLSON COORS BREWING COMPANY AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN MILLIONS, EXCEPT PAR VALUE)
(UNAUDITED)

|  | As of |
| --- | --- |
|  | March 31, 2017 |
| Deferred tax liabilities | 1,762.6 |
| Other liabilities | 307.2 |
| Discontinued operations | 13.1 |
| Total liabilities | 17,732.6 |
| Commitments and contingencies (Note 16) | |
| Molson Coors Brewing Company stockholders' equity | |
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 204.2 shares and 203.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 108.4 |
| Class B exchangeable shares, no par value (issued and outstanding: 15.1 shares and 15.2 shares, respectively) | 567.6 |
| Paid-in capital | 6,629.9 |
| Retained earnings | 6,232.0 |
| Accumulated other comprehensive income (loss) | (1,470.2) |

---

[13] On November 13, 2019, the Company announced that Tabolt would cease his services as the Principal Accounting Officer on or prior to July 1, 2021.

| | | |
|---|---|---|
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | | 11,598.3 |
| Noncontrolling interests | | 212.0 |
| Total equity | | 11,810.3 |
| Total liabilities and equity | $ | 29,542.9 |

Q1 2017 10-Q at 6.

**Integration and Restructuring of MillerCoors**

115.    As to the assets and liabilities assumed by Molson in the Acquisition, the Q1 2017 10-Q stated that the "***detailed valuation analyses necessary to assess the fair values of the tangible and intangible assets acquired and liabilities assumed and goodwill recognized have been completed***."  Q1 2017 10-Q at 13.  "***There have been no changes to these allocated amounts in the first quarter of 2017***."  *Id.*

116.    According to the Q1 2017 10-Q, "[b]eginning in 2016, restructuring initiatives related to the integration of MillerCoors after the completion of the Acquisition were implemented in order to operate a more efficient business and achieve cost saving targets which to-date resulted in reduced employment levels by approximately 63 employees."  Q1 2017 10-Q at 19.  Molson was continually evaluating the "cost structure" and seeking "opportunities for further efficiencies and cost savings as part of these initiatives."  *Id.*

117.    In the Regional Financial Highlights discussing MillerCoors as the U.S. Segment, the Q1 2017 10-Q noted income from continuing operations before income taxes of $315.6 million compared to $337.6 million (reported as 42% economic interest prior to the Acquisition). The lower income post-Acquisition was attributed to "lower volume and higher cost of goods sold per hectoliter partially offset by lower special charges related to the Eden brewery closure." Q1 2017 10-Q at 43.

118.    In terms of outlook, the 10-Q noted that in the U.S., Molson's "goal of flat volume in 2018 and growth in 2019 has not changed."  Q1 2017 10-Q at 58.

**No Change in Internal Control**

119.    Under "Changes in Internal Control over Financial Reporting," the Q1 2017 10-Q reported, "There were ***no changes in our internal control over financial reporting (as defined***

*in Exchange Act Rule 13a-15(f)) during the three months ended March 31, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." Q1 2017 10-Q at 65.

120.    In the Section 302 Certifications of the CEO and CFO, dated May 3, 2017 (both attached to the Q1 2017 10-Q), Hunter and Joubert respectively certified that the Q1 2017 10-Q "*does not contain any untrue statement of material fact*" and that they are "*responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting* (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))." *See* Q1 2017 10-Q at Exs. 31.1 and 31.2.

121.    In the 302 Certifications (Exs. 31.1 and 31.2), Hunter and Joubert each certified that they had done the following: (i) designed or caused to be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries, is provided; (ii) designed or caused to be designed internal control over financial reporting that "*provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*"; (iii) *evaluated the effectiveness of the disclosures and procedures and presented the conclusions about the effectiveness of such controls*; and (iv) *disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting.* Based on this evaluation, *Hunter disclosed "all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impact reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting*. Q1 2017 10-Q at Exs. 31.1 and 31.2.

122.    Hunter and Joubert also each provided a "Written Statement" pursuant to Section 906 of SOX that the Q1 2017 10-Q fully complied with the requirements of Section 13(a) and 15(d) of the Exchange Act. *See* Q1 2017 10-Q at Ex. 32.

**Q1 2017 Earnings Release**

123.    In Table 13 (Condensed Consolidated Balance Sheets) of the Q1 2017 Earnings Release, Molson reported the following "Liabilities and Equity" as of March 31, 2017:

*Deferred Tax Liabilities*     *$  1,762.6*
*Total Liabilities*            *$17,732.6*
*Retained Earnings*            *$  6,232.0*
*Total Equity*                 *$11,810.3*
*($ In millions)*

**D.     Reasons Why Statements Regarding its Q1 2017 Results were False and Misleading**

124.    The above highlighted statements identified in ¶¶ 110-123 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)     Defendants admitted that they ***understated the Company's deferred tax and total liabilities***, which meant that ***retained earnings and total shareholder equity were overstated*** as follows:

| | As of | | |
|---|---|---|---|
| | March 31, 2017 | | |
| | As Reported | | As Revised |
| Consolidated Balance Sheets: | | | |
| Deferred tax liabilities | $    1,762.6 | $ | 2,161.7 |
| Total liabilities | $   17,732.3 | $ | 18,131.4 |
| Retained earnings | $    6,265.5 | $ | 5,866.4 |
| Total Molson Coors Brewing Company stockholders' equity | $   11,602.9 | $ | 11,203.8 |
| Total equity | $   11,814.9 | $ | 11,415.8 |

(b)     Defendants ignored concerns raised by market analysts about the calculation and treatment of tax liabilities related to the Acquisition, which suggested that the "related cash tax benefits" should have been reported with the Company's normal tax reporting structure;

(c)     Defendants falsely assured market analysts that they would reconsider the related tax benefits (which includes liabilities) associated with the Acquisition but failed to do so and failed to disclose the materially misstated financial statements (described above), along with

the material weaknesses in financial reporting (resulting in a failure to properly calculate deferred tax and total liabilities);

(d)     The Company's **understatement of deferred tax liabilities by 22% and overstatement of retained earnings by 6%** permitted Defendants to falsely inflate its impact on Molson's consolidated balance sheet;

(e)     Defendants' representations that Molson had undertaken "a detailed valuation analysis" necessary to assess the value of MillerCoors' assets and "the liabilities assumed" were false and misleading because such a detailed analysis would have revealed the misstated deferred tax and total liabilities, along with the material weaknesses in financial reporting (resulting in a failure to reconcile the book-tax differences and properly report deferred tax and total liabilities);

(f)     By publicly reporting on the Company's financial condition, certifying these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(g)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(h)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(i)     Defendants falsely attested that the financial statements did not contain any untrue statement of material facts and had disclosed any fraud involving management or any employee involving internal control over financial reporting; and

(j)      Defendants falsely stated that Molson had adequate controls.

**E.   False and Misleading Statements – Q2 2017 Results**

125.     On August 2, 2017, the Company filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2017 (Quarterly Report (Form 10-Q)(Aug. 2, 2017)) ("Q2 2017 10-Q"), held its Q2 2017 Molson Earnings Call ("Q2 2017 Earnings Call"), and published on BUSINESS WIRE its Q2 2017 results entitled: "Molson Coors Reports 2017 Second Quarter Results" ("Q2 2017 Earnings Release").

**Q2 2017 Earnings Release**

126.     In the introduction to the Company's Q2 2017 Earnings Release, Hunter stated that Defendants continued "driving the integration of MillerCoors and the Miller brands globally to unlock synergies and other cost savings" and that as "a sign of progress against this agenda," they delivered solid growth in net income.   As a Quarterly Highlight, the Q2 2017 Earnings Release touted *that net income from operations had increased 4% and net income had increased 2%*, "driven by increased brand volume, higher net pricing…cost savings and lower marketing spending, partially offset by a higher effective tax rate."

127.     The Q2 2017 Earnings Release included a "Condensed Consolidated Balance Sheet" which provided the following information, in pertinent part:

| | |
|---|---|
| *Deferred Tax Liabilities* | *$ 1,865.2* |
| *Total Liabilities* | *$17,812.8* |
| *Retained Earnings* | *$ 6,467.0* |
| *Total Molson Equity* | *$12,095.9* |
| *Total Equity* | *$12,305.8* |
| *($ In millions)* | |

**Q2 2017 Earnings Call**

128.     On Q2 2017 Earnings Call, Defendants reiterated many of the financial highlights of the Q2 2017 Earnings Release.   Hunter noted that as "as a sign of progress" that Molson management had *delivered solid growth in net income and earnings per share and reiterated the net income increase of 4%.*   TAP Q2 2017 (Bloomberg) Tr. at 2.

129.   In commenting on the results for just MillerCoors, the CEO of MillerCoors (Hattersley) noted that "[i]t's no secret that the beer industry in June was soft according to Nielsen" and "June was a rough month from an industry point of view."   TAP Q2 2017 (Bloomberg) Tr. at 8.

**SEC Filings: Q2 2017 10-Q**

130.   Molson's Q2 2017 10-Q, signed by VP and Controller (Tabolt) as Chief Accounting Officer (*id.* at 76), provided, in pertinent part for the three months ended June 30, 2017, the following Condensed Consolidating Statements of Operations (in millions):

| | |
|---|---:|
| Income tax benefit (expense) | (123.0) |
| Net income (loss) from continuing operations | 326.8 |
| Income (loss) from discontinued operations, net of tax | 1.6 |
| Net income (loss) including no controlling interests | 328.4 |
| Net (income) loss attributable to no controlling interests | (5.1) |
| Net income (loss) attributable to Molson Coors Brewing Company[14] | $ 323.3 |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share: | |
|    From continuing operations | $ 1.49 |
|    From discontinued operations | 0.01 |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share | $ 1.50 |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share: | |
|    From continuing operations | $ 1.49 |
|    From discontinued operations | — |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share | $ 1.49 |
| Weighted-average shares—basic | 215.4 |
| Weighted-average shares—diluted | 216.4 |
| Amounts attributable to Molson Coors Brewing Company | |
|    Net income (loss) from continuing operations | $ 321.7 |
|    Income (loss) from discontinued operations, net of tax | 1.6 |
|    Net income (loss) attributable to Molson Coors Brewing Company | $ 323.3 |

Q2 2017 10-Q at 4.

131.   The Q2 2017 10-Q provided the following Condensed Consolidated Balance Sheets, in pertinent part, for the second quarter as of June 30, 2017 (in millions) as follows:

---

[14]   The Condensed Consolidated Statements of Stockholder Equity, Net Income (loss), including non-controlling was $335 million.  Q2 2017 10-Q at 8.

| | |
|---|---|
| Deferred tax liabilities | 1,865.2 |
| Other liabilities | 317.2 |
| Discontinued operations | 12.4 |
| Total liabilities | 17,812.8 |
| Commitments and contingencies (Note 16) | |
| Molson Coors Brewing Company stockholders' equity | |
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 204.6 shares and 203.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 107.7 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.7 shares and 15.2 shares, respectively) | 554.4 |
| Paid-in capital | 6,658.5 |
| Retained earnings | 6,467.0 |
| Accumulated other comprehensive income (loss) | (1,222.3) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 12,095.9 |
| Noncontrolling interests | 209.9 |
| Total equity | 12,305.8 |

Q2 2017 10-Q at 6.

**Outlook for 2017**

132.   The Q2 2017 10-Q Outlook notes: "[W]e continue to focus on both top- and bottom –line performance, driven by our first choice consumer and customer agenda and the integration of MillerCoors and the Miller brands globally to realize synergies and other cost savings" and reiterated the goal of flat volume in 2018.  Q2 2017 10-Q at 64.

**No Change in Internal Control**

133.   Under "Changes in Internal Control over Financial Reporting," the Q2 2017 10-Q reported:  "There were **no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the three months ended June 30, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**." Q2 2017 10-Q at 73.

**Certifications**

134.   In a Section 302 Certification (attached to the Q2 2017 10-Q, signed August 2, 2017), Joubert as CFO and Hunter as CEO each certified that the Q2 2017 10-Q "*does not contain any untrue statement of material fact*" and that she or he is "*responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and *internal control over financial reporting* (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))." Q2 2017 10-Q at Exs. 31.1 and 31.2.

135.   In the 302 Certification (Exs. 31.1 and 31.2), Hunter and Joubert certify that he or she has done the following:  (i) designed or caused to be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries, is provided; (ii) designed or caused to be *designed internal control over financial reporting that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; (iii) evaluated the effectiveness of the disclosure and procedures* and presented the conclusions about the effectiveness of such controls; and (iv) disclosed in this report *any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting.*  Based on this evaluation, the Executive Defendants represented that they had *disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*" which impacted reporting financial information and disclosed any fraud involving management or any employee, whether material or not, who have a significant role in internal control over reporting. *See* Q2 2017 10-Q at Exs. 31.1 and 31.2.

136.   Both Hunter and Joubert each provided a "Written Statement" pursuant to Section 906 of SOX that the Q2 2017 10-Q fully complies with the requirements of Section 13(a) and 15(d) of the Exchange Act. *See* Q2 2017 10-Q at Ex. 32.

**F.**      **Reasons Why Statements Regarding its Q2 2017 Results were False and Misleading**

137.    The above highlighted statements identified in ¶¶ 126-136 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)      Defendants admitted that they *understated the Company's deferred tax and total liabilities*, which meant that *retained earnings and total shareholder equity was overstated* as follows:

|  | As of June 30, 2017 | | | |
|  | As Reported | | As Revised | |
|---|---|---|---|---|
| Consolidated Balance Sheets: | | | | |
| Deferred tax liabilities | $ | 1,865.2 | $ | 2,267.2 |
| Total liabilities | $ | 17,812.2 | $ | 18,214.2 |
| Retained earnings | $ | 6,507.1 | $ | 6,105.1 |
| Total Molson Coors Brewing Company stockholders' equity | $ | 12,105.5 | $ | 11,703.5 |
| Total equity | $ | 12,315.4 | $ | 11,913.4 |

*See* 2018 10-K at 172.

(b)      Defendants admitted that its statement of net income for Q2 2017 was *overstated* making the statement that net income increased by 4% false and misleading;

(c)      Defendants' *understatement of tax liabilities by over 21%* and *overstatement of retained earnings by over 6%* permitted the Defendants to portray Molson's financial condition in its consolidated balance sheets as stronger than it actually was after the Acquisition;

(d)      By publicly reporting on the Company's financial condition, certifying these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(e)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(f)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(g)     Defendants falsely attested that the financial statements do not contain any untrue statement of material facts and had disclosed any fraud involving management or employee involving internal control over financial reporting; and

(h)     Defendants falsely stated that Molson had adequate controls.

## G.     False and Misleading Statements – Q3 2017 Results

138.   On November 1, 2017, the Company filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (Quarterly Report (Form 10-Q)(Nov. 1, 2017))("Q3 2017 10-Q"), held its Q3 2017 Molson Earnings Call ("Q3 2017 Earnings Call"), and published on BUSINESS WIRE its Q3 2017 results entitled: "Molson Coors Reports 2017 Third Quarter Results ("Q3 2017 Earnings Release").

## Q3 2017 Earnings Release

139.   In the introduction to the Q3 2017 Earnings Release, Hunter stated that "[d]espite challenging market conditions in North America, we remain on track to deliver our 2017 business and financial plans . . . ."  According to the Q3 2017 Earnings Release, Defendants viewed the "value creation from the MillerCoors transaction" through the lens of three numbers: net earnings of $289.7 million; $109 million of Acquisition related cash tax benefits; and $11 million of Acquisition related after tax book amortization.   To calculate on a per share basis, the Defendants provided the amount of diluted shares outstanding in Q3 2017:  216.5 million.

140.    The Q3 2017 Earnings Release included a "Condensed Consolidated Balance Sheet" which provided the following information, in pertinent part:

*Deferred Tax Liabilities*      *$ 1,932.4*

*Total Liabilities*                  *$17,981.1*

*Retained Earnings*            *$ 6,658.7*

*Total Molson Equity*        *$12,488.2*

*Total Equity*                      *$12,696.6*

*($ In millions)*

## Q3 2017 Earnings Call

141.    On the Q3 2017 Earnings Call, Defendants reiterated many of the financial highlights of the Q3 2017 Earnings Release.  Hunter started and concluded his remarks with the following:  "[O]ne year from the close of the MillerCoors transaction, the bigger, better and stronger [Molson] is driving a cohesive and distinctive First Choice commercial agenda, an expanded International business, a more efficient global organization, and ***a relentless focus on financial performance, all underpinned by highly engaged employees who are playing to win***."  TAP Q3 2017 (Bloomberg) Tr. at 2, 6.  Hunter also acknowledged that the business environment in North America "remains more challenging than anticipated." *Id.* at 4.

142.    On the Q3 2017 Earnings Call, Joubert provided the financial highlights which included a 2.1% ***decrease*** in net sale due to lower financial volume, partially offset by positive global pricing, sales mix, royalty volume and foreign currency movements.  TAP Q3 2017 (Bloomberg) Tr. at 2.  Joubert also stated that "it is important to remember, the cash tax benefits associated with the MillerCoors transaction, which were $109 million this quarter, and are expected to be more than $400 million for the full year of 2017." *Id.* at 4.

143.    At the Q3 2017 Earnings Call, the market analysts recognized the overall industry decline in sales and asked "if there was any remedial action you took in response to the volume declines."  TAP Q3 2017 (Bloomberg) Tr. at 12.  Hunter responded, "I think it's fair to say we've come through both Q2 and Q3 and industry demand in the US has been more sluggish

than it was anticipated.  And again, we've been consistent that we're retaining flexibility in our P&L to ensure that we've got levers to pull if volume isn't coming through as anticipated.  We did that through the third quarter." *Id.*

**SEC Filings – Q3 2017 10-Q**

144.   The Q3 2017 10-Q, signed by VP and Controller (Tabolt) as Chief Accounting Officer (*id.* at 75), provided, in pertinent part, the following Condensed Consolidated Balance Sheets, for the third quarter as of September 30, 2017 (in millions) as follows:

| | |
|---|---:|
| Deferred tax liabilities | 1,932.4 |
| Other liabilities | 309.9 |
| Discontinued operations | 12.9 |
| Total liabilities | 17,981.1 |
| Commitments and contingencies (Note 16) | |
| Molson Coors Brewing Company stockholders' equity | |
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 204.7 shares and 203.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 107.7 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.7 shares and 15.2 shares, respectively) | 553.2 |
| Paid-in capital | 6,676.6 |
| Retained earnings | 6,658.7 |
| Accumulated other comprehensive income (loss) | (1,038.6) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 12,488.2 |
| Noncontrolling interests | 208.4 |
| Total equity | 12,696.6 |
| Total liabilities and equity | $30,677.7 |

Q3 2017 10-Q at 6.

**No Change in Internal Control**

145.   Under "Changes in Internal Control over Financial Reporting," the Q3 2017 10-Q reported: "***There were no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the three months ended September 30, 2017, that***

*have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." Q3 2017 10-Q at 72.

**Certifications**

146.    In a Section 302 Certification (attached to the Q3 2017 10-Q, signed November 1, 2017), Joubert as CFO and Hunter as CEO each certified that the Q3 2017 10-Q "*does not contain any untrue statement of material fact*" and that she or he is "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))." *See* Q3 2017 10-Q at Exs. 31.1 and 31.2.

147.    In the 302 Certification (Exs. 31.1 and 31.2), Hunter and Joubert each certified that he or she has done the following:  (i) *designed or caused to be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries*, is provided; (ii) designed or caused to be designed internal control over financial reporting that "*provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*"; (iii) *evaluated the effectiveness of the disclosure and procedures* and the presented the conclusions about the effectiveness of such controls; and (iv) *disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting.*  Based on this evaluation, the Executive Defendants certified that they had disclosed "*all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impact reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting*. *See* Q3 2017 10-Q at Exs. 31.1 and 31.2.

148.    Hunter and Joubert each provided a " Written Statement" pursuant to Section 906 of SOX that the Q3 2017 10-Q *fully complies with the requirements of Section 13(a) and 15(d) of the Exchange Act*. *See* Q3 2017 10-Q at Ex. 32.

**H.      Reasons Why Statements Regarding its Q3 2017 Results were False and Misleading**

149.    The above highlighted statements identified in ¶¶ 139-148 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)      Defendants admitted that they ***understated the Company's deferred tax and total liabilities***, which meant that ***retained earnings and total shareholder equity were overstated*** as follows:

| (In Millions) | September 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | As Reported | | As Revised | |
| Consolidated Balance Sheets: | | | | |
| Deferred tax liabilities | $ | 1,932.4 | $ | 2,308.2 |
| Total liabilities | $ | 17,980.2 | $ | 18,356.0 |
| Retained earnings | $ | 6,705.8 | $ | 6,330.0 |
| Total Molson Coors Brewing Company stockholders' equity | $ | 12,503.0 | $ | 12,127.2 |
| Total equity | $ | 12,711.4 | $ | 12,335.6 |

*See* 2018 10-K at 172.

(b)      By ***understating deferred tax liabilities by nearly 20%*** and ***overstating retained earnings by over 5%***, Defendants portrayed Molson's financial condition as stronger in its Consolidated Balance Sheet than it actually was after the Acquisition;

(c)      By publicly reporting on the Company's financial condition, certifying these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(d)      In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(e)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation, and that they were responsible for establishing and maintaining disclosure controls, and had personally evaluated the effectiveness of these disclosures;

(f)     Defendants falsely attested that the financial statements did not contain any untrue statement of material facts and that they had disclosed any fraud involving management or any employee involving internal control over financial reporting; and

(g)     Defendants falsely stated that Molson had adequate controls.

**I.     False and Misleading Statements Regarding Q4 and FY 2017 Results**

150.    On February 12, 2018, when the Company filed on Form 10-K its annual report for year ended December 31, 2017 ("2017 10-K"), it held its Q4 2017 Molson Earnings Call ("Q4 2017 Earnings Call"), and published on BUSINESS WIRE its results for Q4 2017 and FY 2017 entitled "*Molson Coors Reports 2017 Full Year and Fourth Quarter Results*" ("Q4 2017 Earnings Release").

**SEC Filings: 2017 10-K**

151.    The 2017 10-K also provided Consolidated Balance Sheets which provided in pertinent part (at 84):

(IN MILLIONS)

| Liabilities and equity | As of | |
|---|---|---|
| | December 31, 2017 | December 31, 2016 |
| Deferred tax liabilities | 1,648.6 | 1,699.0 |
| Other liabilities | 304.4 | 267.0 |
| Discontinued operations | 12.4 | 12.6 |
| Total liabilities | 16,811.9 | 17,719.8 |
| Commitments and contingencies (Note 19 ) | | |
| Molson Coors Brewing Company stockholders' equity | | |
| Capital stock: | | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — | |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 204.7 shares and 203.7 shares, respectively) | 2.0 | 2.0 |

| | | |
|---|---|---|
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 107.7 | 108.1 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.7 shares and 15.2 shares, respectively) | 553.2 | 571.2 |
| Paid-in capital | 6,688.5 | 6,635.3 |
| Retained earnings | 7,206.1 | 6,145.3 |
| Accumulated other comprehensive income (loss) | (860.0) | (1,571.8) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 13,226.1 | 11,418.7 |
| Noncontrolling interests | 208.9 | 203.0 |
| Total equity | 13,435.0 | 11,621.7 |

152.   As part of the 2017 10-K, Hunter and Joubert each signed a Management Report stating, "The preparation, integrity and objectivity of the financial statements and all other financial information included in this annual report are the responsibility of the management of Molson Coors Brewing Company."   Both certified that the *"financial statements have been prepared in accordance with generally accepted accounting principles in the United States" and that "all material uncertainties have been appropriately accounted for and disclosed*." 2017 10-K at 79.

153.   Hunter and Joubert each also stated as part of the Management Report:

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013 Framework). *Based upon its assessment, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was effective.*

*Id.*

154.   The 2017 10-K (at 174) also stated in pertinent part:

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining effective internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles*. A company's internal control over financial reporting includes those policies and procedures that

(i) *pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company*; (ii) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

\*   \*   \*

Our Chief Executive Officer and Chief Financial Officer, with assistance from other members of management, assessed the effectiveness of our internal control over financial reporting as of December 31, 2017, based on the framework and criteria established in Internal Control—Integrated Framework (2013 Framework), issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on its evaluation, management has concluded that our internal control over financial reporting was effective as of December 31, 2017.*

155.    According to the 2017 10-K,  "*There were no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended December 31, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." *Id.*

156.    Hunter, as President, CEO and Director, signed the 2017 10-K under the requirements of Section 13 or 15(d) of the Exchange Act of 1934, followed by Joubert's signature as CFO. *Id.* at 185.  The Director Defendants also signed the 2017 10-K. *Id.*

157.    In the Section 302 Certification of the CEO and CFO, dated February 14, 2018, (both attached to the 2017 10-K), Hunter and Joubert each certified that the 2017 10-K "*does not contain any untrue statement of material fact*" and that they were "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))." *See* 2017 10-K at Exs. 31.1 and 31.2.

158.    In the 302 Certifications (Exs. 31.1 and 31.2), Hunter and Joubert each certified that they have done the following: (i) designed or caused to be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries, is

provided; (ii) designed or caused to be designed internal control over financial reporting that *"provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"*; (iii) *evaluated the effectiveness of the disclosure and procedures and the presented the conclusions about the effectiveness of such controls*; and (iv) *disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting*. Based on this evaluation, the Executive Defendants each certified that they had disclosed *"all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impact reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting*. 2017 10-K at Exs. 31.1 and 31.2.

159.    Hunter and Joubert also each provided a "Written Statement" pursuant to Section 906 of SOX that the 2017 10-K fully complies with the requirements of Section 13(a) and 15(d) of the Exchange Act. *See* 2017 10-K at Ex. 32.

**Q4 2017 Earnings Call**

160.    At the Q4 2017 Earnings Call, in the financial headlines, Joubert noted that US GAAP net income increased from the prior year and the improvement *"was primarily due to a discrete tax benefit related to the revaluation of [MillerCoor's] deferred tax balances*…." TAP Q4 2017 (Bloomberg) Tr. at 3.

**Q4 2017 Earnings Release**

161.    The Q4 2017 Earnings Release reiterated the financial highlights provided on the Earnings Call and again referenced a *"revaluing of deferred tax liabilities"* which resulted in a negative tax rate for the quarter.

**J.    Reasons Why Statements Regarding the Company's FY 2017 and Q4 Results were False and Misleading**

162.    The above highlighted statements identified in ¶¶ 151-161 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial

reporting as follows:

(a)     Defendants admitted that they **understated the Company's deferred tax and total liabilities**, which meant that **retained earnings and total shareholder equity was overstated** as follows:

| | As of December 31, 2017 | | As of December 31, 2016 | |
|---|---|---|---|---|
| | As Reported | As Restated | As Reported | As Restated |
| | (In millions) | | | |
| Consolidated Balance Sheets: | | | | |
| Deferred tax liabilities | $ 1,648.6 | $ 1,896.3 | $ 1,699.0 | $ 2,098.1 |
| Total liabilities | $ 16,811.9 | $ 17,059.6 | $ 17,719.8 | $ 18,118.9 |
| Retained earnings | $ 7,206.1 | $ 6,958.4 | $ 6,145.3 | $ 5,746.2 |
| Total Molson Coors Brewing Company stockholders' equity | $ 13,226.1 | $ 12,978.4 | $ 11,418.7 | $ 11,019.6 |
| Total equity | $ 13,435.0 | $ 13,187.3 | $ 11,621.7 | $ 11,222.6 |

*See* 2018 10-K at 90.

(b)     Defendants **understated deferred tax liabilities by over 15% and overstated retained earnings by almost 4%** which allowed the Acquisition to look better in the Company's Consolidated Balance than it actually was;

(c)     Although Molson understated its net income and its income tax benefit in its consolidated FY 2017 financial statements prior to the restatement, the net impact in the Company's consolidated statements for FY 2016 and FY 2017 was **a net understatement of income tax expense of $247.7 million**;

(d)     By publicly reporting on the Company's financial condition, certifying these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon ;

(e)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate

deferred tax and total liabilities;

(f)     Defendants   falsely   claimed   to   have   properly   revaluated   MillerCoor's deferred tax and total liabilities but the net impact (***an understatement of $247.7 million***) along with the  material weaknesses in financial reporting (resulting in a failure to properly revalue liabilities)   remained   undisclosed,   and   deferred   tax   and   total   liabilities   remained   materially misstated;

(g)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(h)     Defendants falsely attested that the financial statements did not contain any untrue  statement  of  material  facts  and  had  disclosed  any  fraud  involving  management  or employee involving internal control over financial reporting; and

(i)     Defendants falsely certified that Molson had adequate controls.

### K.     False and Misleading Statements – Q1 2018 Results

163.     On May 2, 2018, the Company filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (Quarterly Report (Form 10-Q)(May 2, 2018)) ("Q1 2018 10-Q"), held  its  Q1  2018  Molson  Earnings  Call    ("Q1  2018  Earnings  Call"),  and  published  on BUSINESS  WIRE  its  Q1  2018  results  entitled:  "Molson  Coors  Reports  2018  First  Quarter Results" ("Q1 2018 Earnings Release").

### SEC Filings: Q1 2018 10-Q

164.     Molson's  Q1  2018  10-Q,  signed  by  VP  and  Controller  (Tabolt)  as  Chief Accounting Officer (at 57), provided, in pertinent part, the following Condensed Consolidated Balance Sheets (in millions) (at 7):

| Deferred tax liabilities | 1,688.7 |
|---|---|
| Other liabilities | 338.9 |
| Total liabilities | 16,521.0 |
| Commitments and contingencies (Note 14) | |
| Molson Coors Brewing Company stockholders' equity | |

| | |
|---|---:|
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 205.1 shares and 204.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 107.7 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.7 shares and 14.7 shares, respectively) | 553.2 |
| Paid-in capital | 6,697.4 |
| Retained earnings | 7,367.9 |
| Accumulated other comprehensive income (loss) | (810.9) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 13,445.9 |
| Noncontrolling interests | 217.6 |
| Total equity | 13,663.5 |
| Total liabilities and equity | $ 30,184.5 |

**Integration and Restructuring of MillerCoors**

165.   The Q1 2018 10-Q stated: "***Beginning in 2016,*** restructuring initiatives related to the integration of MillerCoors after the completion of the Acquisition were implemented in order ***to operate a more efficient business*** and achieve cost saving targets." This restructuring included "reduced employment levels by approximately 103 employees." Q1 2018 10-Q at 21. This strategic review began in 2014 with "restructuring activities related to the closure or planned closure of breweries, as well as ***activities related to business efficiencies***" which reduced employment levels by a total of 416 employees. *Id.* These severance and other employee-related charges were "recorded as special items within our unaudited condensed consolidated statements of operations." *Id.*

166.   According to the Q1 2018 10-Q, effective January 1, 2018, MillerCoors USA LLC, a new entity with no historic activity, was added as a subsidiary guarantor. *Id.* at 32. In addition, effective December 26, 2017, its historical subsidiary guarantor, Jacob Leinenkugel Brewing Co., LLC, was merged with and into the existing subsidiary guarantor, MillerCoors and, on January 1, 2018, its historical subsidiary guarantors MillerCoors Holdings LLC and MC Holding Company LLC were also merged with and into MillerCoors. *Id.* In Q1 2018,

MillerCoors declared a distribution of approximately $1.7 billion to Molson, which was simultaneously non-cash settled via offset to an equal amount of payables that were owed by Molson to MillerCoors. *Id.*

167.    Under Special Items, the Q1 2018 10-Q provided the following update on the Acquisition: "[O]n January 21, 2018, MCBC and ABI entered into a settlement agreement related to the purchase price adjustment under the purchase agreement, and on January 26, 2018, pursuant to the settlement agreement, ABI paid to MCBC $330.0 million, of which $328.0 million constitutes the Adjustment Amount." Q1 2018 10-Q at 21. The gain was recorded within special items (net) in the Corporate segment and as cash provided by operating activities. *Id.*

**No Change in Internal Control**

168.    Under "Changes in Internal Control over Financial Reporting," the Q1 2018 10-Q reported: "***There were no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the three months ended March 31, 2018, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***" Q1 2018 10-Q at 55.

**Impact of the 2017 Tax Act**

169.    Under "Effective Tax Rate", the Q1 2018 10-Q noted that the "decrease in the effective tax rate during the first quarter of 2018 versus 2017, is primarily driven by the reduction of the statutory U.S. federal corporate income tax rate from 35% to 21% as a result of the 2017 Tax Act." Q1 2018 10-Q at 22.

**Certifications**

170.    In the Section 302 Certification (attached to the Q1 2018 10-Q), both Joubert as CFO and Hunter as CEO each certified that the Q1 2018 10-Q "***does not contain any untrue statement of material fact***" and that they were "***responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-***

*15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))*." *See* Q1 2018 10-Q at Exs. 31.1 and 31.2.

171. In the 302 Certifications (Exs. 31.1 and 31.2), Hunter and Joubert certified that they have done the following: (i) designed or caused to be ***designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries***, is provided; (ii) designed or caused to be designed internal control over financial reporting that ***"provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; (iii) evaluated the effectiveness of the disclosure*** and procedures and the presented the conclusions about the effectiveness of such controls; and (iv) ***disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting.*** Based on this evaluation, the Executive Defendants certified ***"all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impact reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting.*** Q1 2018 10-Q at Exs. 31.1 and 31.2.

172. Both Hunter and Joubert also provided a "Written Statement" pursuant to Section 906 of SOX that the Q1 2018 10-Q ***fully complied with the requirements of Section 13(a) and 15(d) of the Exchange Act.*** *See* Q1 2018 10-Q at Ex. 32.

**Q1 2018 Earnings Release**

173. The subtitled highlights on the Company's  Q1 2018 Earnings Release says it all: "*Lower Net Sales and Underlying Net Income (Non-GAAP) Driven Primarily [b]y Weak U.S. Industry Conditions;*" "*Management Remains Committed to Delivering Full-Year Business Plans;*" and "*Underlying EPS (Non-GAAP) of $0.48 Decreased by 40.0%.*"

174.    The Q1 2018 Earnings Release noted that "The U.S. beer industry had a softer-than-anticipated start to the year, which impacted both top- and bottom-line performance…." The Condensed Consolidated Balance Sheets reported the following (in millions):

> *Deferred Taxes*        *$1,688.7*
>
> *Retained Earnings*     *$7,367.9*

**Q1 2018 Earnings Call**

175.    In the Q1 2018 Earnings Call, Hunter reiterated that the U.S. beer industry had "softer-than-anticipated start to the year, which has impacted both top and bottom line performance." TAP Q1 2018 (Bloomberg) Tr. at 2.   Providing financial highlights, Joubert stated that "net sales decreased by 4.8% due to lower financial and royalty volumes" and "worldwide brand volume decreased by 3.1%" with a U.S. brand volume (MillerCoors) decline of 3.8%. *Id.* at 3, 4.

176.    In responding to analysts' comments at the Q1 2018 Earnings Call including that Molson was "off to a tough start", Hunter reiterated that management remained "committed to our guidance." TAP Q1 2018 (Bloomberg) Tr. at 9.  According to Hunter, "the good news is that because of disciplines we have in our business around pricing and revenue management . . . gives us flexibility as we go through the year.  So the last thing our business needs is any change in strategy, clearly, our tactics will continue to evolve as we go through the year and take kind of competitive pressures, industry headwinds…" *Id.* at 10.

### L.    Reasons Why Statements Regarding its Q1 2018 Results were False and Misleading

177.    The above highlighted statements identified in ¶¶ 164-176 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)    Defendants admitted that ***they understated the Company's deferred tax and total liabilities***, which meant that ***retained earnings and total shareholder equity was overstated*** as follows:

|  | March 31, 2018 | | | |
|  | As Reported | | As Revised | |
|  | (In millions) | | | |
| Consolidated Balance Sheets: | | | | |
| Deferred tax liabilities | $ | 1,688.7 | $ | 1,936.4 |
| Total liabilities | $ | 16,521.0 | $ | 16,768.7 |
| Retained earnings | $ | 7,367.9 | $ | 7,120.2 |
| Total Molson Coors Brewing Company stockholders' equity | $ | 13,445.9 | $ | 13,198.2 |
| Total equity | $ | 13,663.5 | $ | 13,415.8 |

*See* 2018 10-K at 172.

(b)     Defendants ***understated deferred tax liabilities by 14%***, which permitted the Defendants to portray Molson's tax position and financial condition to be stronger than it actually was after the Acquisition and failed to restate its deferred tax liabilities after yet another revaluation of such liabilities in light of the 2017 Tax Act;

(c)     By publicly reporting on the Company's financial condition, certifying these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(d)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(e)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(f)     Defendants falsely attested that the financial statements do not contain any untrue statement of material facts and had disclosed any fraud involving management or any employee involving internal control over financial reporting; and

(g)     Defendants falsely stated that Molson had adequate controls.

**M.     False and Misleading Statements – Q2 2018 Results**

178.    On August 1, 2018, the Company filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 (Quarterly Report (Form 10-Q)(Aug. 1, 2018)) ("Q2 2018 10-Q"), held its Q2 2018 Molson Earnings Call ("Q2 2018 Earnings Call"), and published on BUSINESS WIRE its Q2 2018 results entitled: "*Molson Coors Reports 2018 Second Quarter Results*" ("Q2 2018 Earnings Release").

**SEC Filings: Q2 2018 10-Q**

179.    Molson's Q2 2018 10-Q, signed by VP and Controller (Tabolt) as Chief Accounting Officer (*id.* at 66), provided, in pertinent part, the following Consolidated Balance Sheet (in millions):

| | |
|---|---:|
| Deferred tax liabilities | 1,771.0 |
| Other liabilities | 328.1 |
| Total liabilities | 16,764.3 |
| Commitments and contingencies (Note 14) | |
| Molson Coors Brewing Company stockholders' equity | |
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 205.1 shares and 204.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.9 shares and 2.9 shares, respectively) | 107.7 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.7 shares and 14.7 shares, respectively) | 553.2 |
| Paid-in capital | 6,707.0 |
| Retained earnings | 7,703.5 |
| Accumulated other comprehensive income (loss) | (1,025.4) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 13,576.6 |
| Noncontrolling interests | 220.0 |
| Total equity | 13,796.6 |
| Total liabilities and equity | $30,560.9 |

Q2 2018 10-Q at 7.

**Restructuring Activities in MillerCoors**

180.    The Q2 2018 10-Q also discussed the restructuring initiatives, which began in 2016, related to the integration of MillerCoors after the completion of the Acquisition and the increased reduction in employees by 450, from the prior quarter's total of 416 employees.   2018 Q2 10-Q at 22.

**No Change in Internal Control**

181.    Under "Changes in Internal Control over Financial Reporting," the Q2 2018 10-Q reported that, ***"[t]here were no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the three months ended June 30, 2018, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***." Q2 2018 10-Q at 63.

**Second Quarter Financial Highlights**

182.    In summarizing Molson's second quarter of 2018 "Financial Highlights", the Q2 2018 10-Q noted that the Company "recognized net income attributable to [Molson] of $424.1 million, or $1.96 per diluted share, representing an increase of $94.2 million versus the prior year." Q2 2018 10-Q at 48.  According to the Q2 2018 10-Q, the increase in net income was "driven by unrealized mark-to-market gains on our commodity positions compared to prior year, cost savings, ***lower income tax expense***, lower interest expense and positive net pricing, partially offset by lower financial volume, higher cost inflation and the impact of adopting the new accounting pronouncement related to revenue recognition." *Id.*

**Certifications**

183.    In a Section 302 Certification (attached to the Q2 2018 10-Q, signed August 1, 2018),  Joubert as CFO and Hunter as CEO each certified that the Q2 2018 10-Q "***does not contain any untrue statement of material fact***" and that she or he was "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))." *See* Q2 2018 10-Q at Exs. 31.1 and 31.2.

184.    In the 302 Certification (Exs. 31.1 and 31.2), Hunter and Joubert each certified that he or she had done the following:  (i) *designed or caused to be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries, is provided*; (ii) *designed or caused to be designed internal control over financial reporting that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"*; (iii) *evaluated the effectiveness of the disclosure and procedures and the presented the conclusions about the effectiveness of such controls*; and (iv) *disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over financial reporting*.  Based on this evaluation, the Executive Defendants certified that they had disclosed "*all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impacted reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting*.  *See* Q2 2018 10-Q at Exs. 31.1 and 31.2.

185.    Both Hunter and Joubert also provided a "Written Statement" pursuant to Section 906 of SOX that the Q2 2018 10-Q fully complied with the requirements of Section 13(a) and 15(d) of the Exchange Act.  *See* Q2 2018 10-Q at Ex. 32.

**Q2 2018 Earnings Release**

186.    The Q2 2018 Earnings Release generally summarized the information presented in the Q2 2018 10-Q with a subtitled headline that "*Sequential Improvement to Top and Bottom Line Reflects Benefits From Global Net Pricing, Cost Savings Delivery, Lower Marketing Spend and U.S. Tax Reform, Despite Worldwide Brand Volumes Down*."  The Condensed Consolidated Balance Sheets contained therein reported the following (in millions):

> *Deferred Taxes*        *$1,771.0*
>
> *Retained Earnings*   *$7,703.5*

Q1 2018 10-Q at 16.

**Q2 2018 Earnings Call**

187.    In the Q2 2018 Earnings Call, Hunter stated that "for the quarter, our underlying EPS growth of 10.6% reflected positive global net pricing, cost savings delivery, lower marketing spend, and a lower tax rate, while we continued to strengthen our balance sheet[s] with lower net debt."   In the U.S., the results "reflected headwinds from the overall beer industry…"   TAP Q2 2018 (Bloomberg) Tr. at 2.   In responding to an analyst question from Morgan Stanley (Mohsenian) that "expectations have been moderated a lot" over the last two years, Hunter responded that "getting our business stabilized and back into growth remains a strategic imperative."   *Id.* at 11, 12.   MillerCoors CEO also responded that "we're not going to get to flat in 2018." *Id.* at 12.

### N.    Reasons Why Statements Regarding its Q2 2018 Results were False and Misleading

188.    The above highlighted statements identified in ¶¶ 178-187 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)    Defendants admitted that they ***understated the Company's deferred tax and total liabilities***, which meant that ***retained earnings and total shareholder equity was overstated*** as follows:

|  | As of June 30, 2018 | |
|---|---|---|
|  | As Reported | As Revised |
|  | (In millions) | |
| Consolidated Balance Sheets: | | |
| Deferred tax liabilities | $   1,771.0 | $   2,018.7 |
| Total liabilities | $   16,764.3 | $   17,012.0 |
| Retained earnings | $   7,703.5 | $   7,455.8 |
| Total Molson Coors Brewing Company stockholders' equity | $   13,576.6 | $   13,328.9 |
| Total equity | $   13,796.6 | $   13,548.9 |

(b)    Molson ***understated deferred tax liabilities by 14%*** and permitted Defendants to portray Molson's financial condition and tax position in its Consolidated Balance Sheet as stronger than they actually were after the Acquisition;

(c)    By publicly reporting on the Company's financial condition, certifying

these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(d)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(e)     In highlighting the impact and critical nature of a lower tax rate on the Company's financial performance, Defendants again omitted any analysis or restatement of its underlying tax liabilities and instead materially understated its deferred tax liabilities;

(f)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(g)     Defendants falsely attested that the financial statements do not contain any untrue statement of material facts and that they had disclosed any fraud involving management or employee involving internal control over financial reporting; and

(h)     Defendants falsely stated that Molson had adequate controls.

**O.     False and Misleading Statements – Q3 2018 Results**

189.     On October 31, 2018, the Company filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 (Quarterly Report (Form 10-Q)(Oct. 31, 2018)) ("Q3 2018 10-Q"), held its Q3 2018 Molson Earnings Call  ("Q3 2018 Earnings Call"), and published on BUSINESS WIRE its Q3 2018 results entitled: "*Molson Coors Reports 2018 Third Quarter Results*" ("Q3 2018 Earnings Release").

**SEC Filings: Q3 2018 10-Q**

190.    Molson's Q3 2018 10-Q, signed by its VP and Controller (Tabolt) as Chief Accounting Officer (*id.* at 69), provided, in pertinent part, the following Consolidated Balance Sheet:

| | |
|---|---|
| Deferred tax liabilities | 1,853.6 |
| Other liabilities | 306.2 |
| Total liabilities | 16,380.3 |
| Commitments and contingencies | |
| Molson Coors Brewing Company stockholders' equity | |
| Capital stock: | |
| Preferred stock, $0.01 par value (authorized: 25.0 shares; none issued) | — |
| Class A common stock, $0.01 par value per share (authorized: 500.0 shares; issued and outstanding: 2.6 shares and 2.6 shares, respectively) | — |
| Class B common stock, $0.01 par value per share (authorized: 500.0 shares; issued: 205.1 shares and 204.7 shares, respectively) | 2.0 |
| Class A exchangeable shares, no par value (issued and outstanding: 2.8 shares and 2.9 shares, respectively) | 103.4 |
| Class B exchangeable shares, no par value (issued and outstanding: 14.8 shares and 14.7 shares, respectively) | 557.4 |
| Paid-in capital | 6,715.9 |
| Retained earnings | 7,953.2 |
| Accumulated other comprehensive income (loss) | (996.4) |
| Class B common stock held in treasury at cost (9.5 shares and 9.5 shares, respectively) | (471.4) |
| Total Molson Coors Brewing Company stockholders' equity | 13,864.1 |
| Noncontrolling interests | 225.9 |
| Total equity | 14,090.0 |
| Total liabilities and equity | $ 30,470.3 |

Q3 2018 10-Q at 7.

**No Change in Internal Control**

191.    Under "Changes in Internal Control over Financial Reporting," the Q3 2018 10-Q reported, that "*There were no changes in our internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the three months ended September 30, 2018, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." Q3 2018 10-Q at 66.

**Third Quarter Financial Highlights**

192.    In summarizing the Company's Third Quarter 2018 "Financial Highlights", the Q3 2018 10-Q (at 49) reported net income of $338.3 million, or $1.56 per diluted share, representing an increase of $51.3 million versus the prior year.  According to the "Financial Highlights," the increase in net income was primarily due to "higher net sales, a net benefit to the U.S. marketing, general and administrative expenses resulting from the amicable resolution of a dispute with a vendor, global marketing optimization, cost savings to manage inflationary pressure, partially offset by higher specials charges and unrealized mark-to-market changes on our commodity positions" and "***further benefited by lower income tax expense*** driven by the reduction to the U.S. federal income tax rate and discrete tax benefits."  *Id.*

**Certifications**

193.    In a Section 302 Certification (attached to the Q3 2018 10-Q, signed October 31, 2018), Joubert (CFO) and Hunter (CEO) each certified that the Q3 2018 10-Q "***does not contain any untrue statement of material fact***" and that she or he is "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))."  *See* Q3 2018 10-Q at Exs. 31.1 and 31.2.

194.    In the 302 Certifications (Exs. 31.1 and 31.2), Hunter and Joubert certified that they have done the following:  (i) designed or caused to ***be designed disclosure controls, to ensure that material information relating to Molson, including its consolidated subsidiaries, is provided***; (ii) designed or caused to be designed internal control over financial reporting that "***provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"***; (iii) ***evaluated the effectiveness of the disclosure and procedures and the presented the conclusions about the effectiveness of such controls***; and (iv) ***disclosed in this report any change in internal control over financial reporting that occurred that has materially affected, or is reasonably likely to materially affect internal control over***

*financial reporting*.  Based on this evaluation, the Executive Defendants therefore purported to have disclosed **"all significant deficiencies and material weakness in design or operation of internal control over financial reporting" which impact reporting financial information and disclosed any fraud involving management or any employee whether material or not who have a significant role in internal control over reporting**.  *See* Q3 2018 10-Q at Exs. 31.1 and 31.2.

195.   Hunter and Joubert also each provided a " Written Statement" pursuant to Section 906 of SOX that the Q3 2018 10-Q fully complied with the requirements of Section 13(a) and 15(d) of the Exchange Act.  *See* Q3 2018 10-Q at Ex. 32.

**Q3 2018 Earnings Release**

196.   The Q3 2018 Earnings Release highlighted that "U.S. GAAP net income increased [by] 17.9%" and that this performance "further benefited from lower income tax expense driven by the reduction in the U.S. federal income tax rate and discrete tax benefits." According to the Q3 2018 Earnings Release, the "**U.S. GAAP effective tax rate** and the **underlying effective tax rate**" decreased from a year ago, primarily due to the reduction of the U.S. federal statutory corporate income tax rate to 21% as a result of U.S. tax reform and impact of discrete tax items. (Emphasis in the original.)  The net discrete tax was "driven primarily by the release of uncertain tax positions…"

197.   The Condensed Consolidated Balance Sheets (in millions) reported the following:

> *Deferred Taxes       $1,853.6*
>
> *Retained Earnings    $7,953.2*

**Q3 2018 Earnings Call**

198.   In the Q3 2018 Earnings Call, Joubert provided the Company's Financial Highlights and stressed the Company's cost savings measures to date "with the additional cost saving initiatives in the U.S., as well as other cost saving initiatives, our 2017 to 2019 program will deliver approximately $700 million versus the $600 million to which we guided previously." TAP Q3 2018 (Bloomberg) Tr. at 4.

199.    On the Q3 2018 Earnings Call, the market analyst from Barclay (Lieberman) noted "the recent updates and changes" in the U.S. organization and was curious "about more functionally the changes that you've made, the new management positions."  The analyst then asked Molson management to comment "on what you…can do better going forward because of this new org structure and what it really sort of looks like, what's different going forward than maybe was the case" a year ago. TAP Q3 2018 (Bloomberg) Tr. at 12.  According to Hunter, it was "ensuring that we've got the right capacity."  *Id.* at 12.  The MillerCoors CEO also commented that "***[w]e looked at every function, and we made changes that we believed were appropriate.***" *Id.*

> **P.      Reasons Why Statements Regarding its Q3 2018 Results were False and Misleading**

200.    The above highlighted statements identified in ¶¶ 189-199 were materially false and/or misleading and failed to disclose material adverse facts about the Company's financial reporting as follows:

(a)      Defendants admitted that they ***understated the Company's deferred tax and total liabilities***, which meant that ***retained earnings and total shareholder equity was overstated*** as follows:

|  | As of September 30, 2018 (in millions) | | | |
|---|---|---|---|---|
|  | As Reported | | As Revised | |
| Consolidated Balance Sheets: |  |  |  |  |
| Deferred tax liabilities | $ | 1,853.6 | $ | 2,101.3 |
| Total liabilities | $ | 16,380.3 | $ | 16,628.0 |
| Retained earnings | $ | 7,953.2 | $ | 7,705.5 |
| Total Molson Coors Brewing Company stockholders' equity | $ | 13,864.1 | $ | 13,616.4 |
| Total equity | $ | 14,090.0 | $ | 13,842.3 |

*See* 2018 10-K at 172.

(b)      Molson understated ***deferred tax liabilities by 13%*** and permitted Defendants to portray Molson's financial condition and tax position as stronger in its Consolidated Balance Sheet than it actually was after the Acquisition;

(c)      By publicly reporting on the Company's financial condition, certifying

these disclosures and highlighting the Company's lower tax expense during the quarter, Defendants falsely assured the public and investors that there were no material misstatements, no change in internal control over their financial reporting, and that their financial statements could be relied upon;

(d)     In so reporting, the Defendants failed to disclose the material misstatements in the Consolidated Balance Sheet (which could no longer be relied upon), along with the material weaknesses in financial reporting, resulting in a failure to properly calculate deferred tax and total liabilities;

(e)     Defendants falsely certified that Molson's financial reporting was reliable, adequate, and effective and had no significant deficiencies or material weaknesses in design or operation and that they were responsible for establishing and maintaining disclosure controls and had personally evaluated the effectiveness of these disclosures;

(f)     Defendants' representations about the effectiveness of, and improvements in, its internal corporate function were false and misleading and omitted to state that Molson lacked appropriate internal controls and experienced weakness in both design and operation;

(g)     Defendants falsely attested that the financial statements did not contain any untrue statement of material facts and that they had disclosed any fraud involving management or employee involving internal control over financial reporting; and

(h)     Defendants falsely stated that Molson had adequate controls.

**Q.     The Truth Is Revealed**

201.    Just a few short months after the updates and changes to Molson's U.S. organization, as noted by analysts in the Q3 2018 Earnings Call, the Company finally and publicly admitted that *its financial statements for the last two years were false and misleading, should be restated and no longer relied upon*.  Further, the Defendants admitted that *a material weakness existed in its internal control related to financial reporting.*

202.    The truth was finally revealed on February 12, 2019.  On that date, Molson filed on Form 8-K with the SEC ("February 12, 2019 8-K") a news release stating in pertinent part:

Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

> On February 8, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of Molson Coors Brewing Company (the "Company"), after discussion with management of the Company and [PwC], the Company's independent registered public accounting firm, concluded that the Company's previously issued consolidated financial statements as of and for the years ended December 31, 2017 and December 31, 2016 should be restated and no longer be relied upon.

*       *       *

> In connection with the restatement, management of the Company has determined that a material weakness existed in the Company's internal control over financial reporting as of December 31, 2018 relating to the design and maintenance of effective controls over the completeness and accuracy of the accounting for and disclosure of the income tax effects of acquired partnership interests. Specifically, the Company did not design appropriate controls to identify and reconcile deferred income taxes associated with the accounting for acquired partnership interests. As a result, the Company's [CEO] and [CFO] have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2018, and the Company's management has concluded that its internal control over financial reporting was not effective as of December 31, 2018.

203.    Molson's stock price fell sharply in the aftermath of these revelations. After closing at $65.36 on February 11, 2019, the Company's stock price dropped to $59.19 per share on February 12, 2019 – more than a 9% drop.

204.    Market analysts all noted the restated financials and disclosed material weakness in internal controls related to restatement of the FY 2016 and FY 2017 financial statements.  As the Flash Note by Evercore ISI dated February 12, 2019 stated, "the material weakness does not inspire confidence."

205.    On February 12, 2019, the Financial Times noted that "shares were down 9.5 per cent by midday in New York after the company …restated financial results" and that "Executives said the accounting problems originated in the group's purchase of the 58 per cent stake it did not already own in MillerCoors, its joint venture with SABMiller."  *See* Financial Times, *Molson Coors shares fall after accounting error revealed,* at https://www.ft.com/content/27c5096a-2ec2-11e9-ba00-0251022932c8.

**VII.    DEFENDANTS ADMIT THAT THEY FALSELY CERTIFIED MOLSON HAD ADEQUATE INTERNAL CONTROLS**

206.    In the February 12, 2019 8-K, Defendants admitted that upon the closing of the Acquisition in the fourth quarter of 2016 and completion of the related deferred income tax calculations, the Company did not reconcile the outside basis deferred income tax liability for the investment in the partnership to the book-tax differences in the underlying assets and liabilities within the partnership and, as a result, the 2016 consolidated financial statements were misstated. As a result, the Company's deferred tax liabilities and deferred tax expense were understated by 20% ($399.1 million), with a corresponding overstatement in net income and earnings per share. The Company's 2017 consolidated financial statements were also restated with an aggregate $247.7 million increase to the Company's deferred tax liabilities and corresponding decrease in retained earnings and total equity as of December 31, 2017.

207.    As a result of the failure to record to correct amount of deferred income taxes, Molson's management (including the Executive Defendants) admitted in the February 12, 2019 8-K that:

> [T]he Company's [CEO] and [CFO] have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2018, and the Company's management has concluded that its internal control over financial reporting was not effective as of December 31, 2018.

208.    Defendants filed regular reports with the SEC and certified pursuant to SOX that these financial reports were reviewed by them and did not contain any material misrepresentations or omissions. These certifications that Molson's financial reporting was accurate and that the Company's internal controls were adequate, were knowingly or recklessly false when filed.   As discussed herein, Molson's consolidated financial statements were materially misstated.

209.    As a result of Defendants' positive (but false) statements about Molson, investors, including Lead Plaintiffs, purchased Molson Class B Common stock at artificially inflated levels and were damaged when the truth was revealed and the artificial inflation was removed from the stock price causing the stock price to decline.

210.   On February 12, 2019, Molson filed its 2018 10-K and was forced to restate its financial statements as follows:

|  | 2018 | 2017 As Restated | 2016[1] As Restated |
|---|---|---|---|
|  | (In millions, except per share data) | | |
| **Consolidated Statements of Operations:** | | | |
| Net sales | $   10,769.6 | $   11,002.8 | $   4,885.0 |
| Net income attributable to MCBC[2] | $   1,116.5 | $   1,565.6 | $   1,593.9 |
| Net income attributable to MCBC per share[2]: | | | |
| Basic | $   5.17 | $   7.27 | $   7.52 |
| Diluted | $   5.15 | $   7.23 | $   7.47 |
| **Consolidated Balance Sheets:** | | | |
| Total assets | $   30,109.8 | $   30,246.9 | $   29,341.5 |
| Current portion of long-term debt and short-term borrowings | $   1,594.5 | $   714.8 | $   684.8 |
| Long-term debt | $   8,893.8 | $   10,598.7 | $   11,387.7 |
| **Other information:** | | | |
| Dividends per share of Class B Common Stock | $   1.64 | $   1.64 | $   1.64 |

(1)   Includes MillerCoors' results of operations on a consolidated basis for the post-Acquisition period October 11, 2016, through December 31, 2016, as well as the assets acquired and related debt issued in connection with the Acquisition.

(2)   Includes the impact of the reduction to the U.S. federal income tax rate as a result of U.S. tax reform in 2017. Additionally, during the first quarter of 2018 [the Company] recorded a gain within special items, net of $328.0 million which constitutes the Adjustment Amount related to the settlement agreement between MCBC and ABI as previously discussed.

211.   In the 2018 10-K, Defendants again admitted that Molson had failed to properly or timely "reconcile the outside basis deferred income tax liability for the investment in the partnership to the book-tax differences in the underlying assets and liabilities within the partnership, which would have identified the difference resulting from the Acquisition" and, as a result, the "consolidated financial statements were misstated."  2018 10-K at 89.

212.   As admitted in the 2018 10-K, the specific impact on the consolidated financial statements is set forth, in pertinent part, below:

(a)   In the FY 2016 Consolidated Statement of Operations, *the income tax expense was understated by 38% and net income was overstated by 20%*:

|  | | Year Ended | |
|---|---|---|---|
|  | | December 31, 2016 | |
|  | | As Reported | As Restated |
|  | | (In millions) | |
| Consolidated Statements of Operations: | | | |
| Income tax benefit (expense) | | $ (1,055.2) | $ (1,454.3) |
| Net income (loss) | | $ 1,998.9 | $ 1,599.8 |
| Net income (loss) attributable to Molson Coors Brewing Company | | $ 1,993.0 | $ 1,593.9 |
| Basic net income (loss) attributable to Molson Coors Brewing Company per share | | $ 9.40 | $ 7.52 |
| Diluted net income (loss) attributable to Molson Coors Brewing Company per share | | $ 9.34 | $ 7.47 |

*See* 2018 10-K at 90.

(b)     In FY 2016 Consolidated Statement of Income, net income was ***overstated by 20%:***

|  | | Year Ended | |
|---|---|---|---|
|  | | December 31, 2016 | |
|  | | As Reported | As Restated |
|  | | (In millions) | |
| Consolidated Statements of Comprehensive Income: | | | |
| Net income (loss) including non-controlling interests | | $ 1,998.9 | $ 1,599.8 |
| Comprehensive income (loss) | | $ 2,128.3 | $ 1,729.2 |
| Comprehensive income (loss) attributable to Molson Coors Brewing Company | | $ 2,125.3 | $ 1,726.2 |

*See* 2018 10-K at 90.

(c)     In the Consolidated Balance Sheets, deferred tax liabilities were ***understated by 23% in FY 2016 and by 15% in FY 2017 and retained earnings were overstated by 6.5% in FY 2016 and 4% in FY 2017***:

|  | As of December 31, 2017 | | As of December 31, 2016 | |
|---|---|---|---|---|
|  | As Reported | As Restated | As Reported | As Restated |
|  | | (In millions) | | |
| Consolidated Balance Sheets: | | | | |
| Deferred tax liabilities | $ 1,648.6 | $ 1,896.3 | $ 1,699.0 | $ 2,098.1 |
| Total liabilities | $ 16,811.9 | $ 17,059.6 | $ 17,719.8 | $ 18,118.9 |
| Retained earnings | $ 7,206.1 | $ 6,958.4 | $ 6,145.3 | $ 5,746.2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Molson Coors Brewing Company stockholders' equity | $ | 13,226.1 | $ | 12,978.4 | $ | 11,418.7 | $ | 11,019.6 |
| Total equity | $ | 13,435.0 | $ | 13,187.3 | $ | 11,621.7 | $ | 11,222.6 |

2018 10-K at 90.

 (d) In the Consolidated Statement of Cash Flows, net income was ***overstated by 20% and the income tax expense was understated by 37%***:

| | | Year Ended December 31, 2016 | | |
|---|---|---|---|---|
| | | As Reported | | As Restated |
| | | (In millions) | | |
| Consolidated Statements of Cash Flows: | | | | |
| Net income (loss) including non-controlling interests | $ | 1,998.9 | $ | 1,599.8 |
| Income tax (benefit) expense | $ | 1,055.2 | $ | 1,454.3 |

*See* 2018 10-K at 90-91.

## VIII. MOLSON'S FINANCIAL STATEMENTS VIOLATED FUNDAMENTAL ACCOUNTING CONCEPTS OF GAAP AND SEC GUIDANCE

### A. GAAP Principles

 213. GAAP principles are recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.  Regulation S-X provides that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. § 210.10-01(a).

 214. The original representations that Molson's financial statements were properly stated and a fair representation of Molson's financial condition were false and misleading, as the financial information was neither in conformity with GAAP, nor was the financial information a "fair representation" of Molson's financial condition.

 215. The following two GAAP provisions that Defendants violated apply directly to deferred income taxes:

(1)     Because tax laws and financial accounting standards differ in their recognition and measurement of assets, liabilities, equity, revenues, expenses, gains, and losses, differences arise between:

a.     The amount of taxable income and pretax financial income for the year

b.     The tax bases of assets or liabilities and their reported amounts in financial statements.  ASC 740-10-25-19.[15]

(2)     An assumption inherent in an entity's statement of financial position prepared in accordance with generally accepted accounting principles (GAAP) is that the reported amounts of assets and liabilities will be recovered and settled, respectively.  Based on that assumption, a difference between the tax basis of an asset or a liability and its reported amount in the statement of financial position will result in taxable or deductible amounts in some future year(s) when the reported amounts of assets are recovered and the reported amounts of liabilities are settled.  ASC 740-10-25-20.

216.    Defendants violated the fundamental GAAP principles that apply to all financial statements:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions (FASB Statement of Concepts Nos. 1, 34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts Nos. 1, 40);

(c)     The principle that financial reporting should provide information about an enterprises' financial performance during a period.  Investors and creditors often use information

---

[15]     The Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") is the sole source of authoritative GAAP other than SEC rules and regulations.

about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts, Nos. 1, 42);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (FASB Statement of Concepts, Nos. 1, 50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASB Statement of Concepts, Nos. 2, 58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts Nos. 2, 79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 95).

217.   Section 13(b)(2) of the Exchange Act entitled, "Periodical and Other Reports" states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall –
> (A)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> (B)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
> (i)     transactions are executed in accordance with management's general or specific authorization;
> (ii)    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted

accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(iii)  access to assets is permitted only in accordance with management's general or specific authorization; and

(iv)  the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

218.  The above SEC regulation was clearly violated by the Company by not filing financial statements that complied with GAAP and by failing to devise and maintain a system of internal accounting controls.

219.  The financial misstatements are not disputed.  On February 12, 2019, Defendants' ability to hide their ongoing accounting fraud finally came to an end, and Molson announced that as a result of their improper accounting practices, Molson was forced to retroactively restate its reported or previously announced consolidated financial statements.  Defendants admitted that Molson made improper accounting entries to the Company's books and engaged in improper accounting schemes to materially misstate deferred tax liabilities and inflate net income, earnings per share and retained earnings and equity.

## IX.   MOLSON LACKED ADEQUATE INTERNAL CONTROLS

220.  Defendants were able to inflate Molson stock prices through accounting improprieties which resulted in materially misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls.  In its 2018 10-K for the year ended December 31, 2018, the Company admitted the following material weaknesses:  (i) material accounting errors; (ii) failure to reconcile the outside basis deferred income tax liability for an acquisition to the book-tax differences in the underlying assets and liabilities within the partnership; (iii) failure to identify the difference in deferred tax liability in a timely manner; (iv) misstatements in the consolidated financial statements including multiple misstatements in the Consolidated Statements of Operation, Consolidated Balance Sheet, and Consolidated Statement of Cash Flows; and (iv) misstatements in income tax expense, net income, earnings per share, deferred tax liabilities, total liabilities, retained earnings and total equity for eleven consecutive quarters.

### A.    Internal Control Framework

221.    A system of internal control helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its internal and external financial and non-financial reporting, and compliance with applicable laws and regulations.  It is management's responsibility to develop and implement the internal controls necessary to ensure that a company maintains adequate and accurate books and records.  Management is defined as:

> Persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions. Persons without formal titles also may be members of management.

ASC 850-10-20-Glossary.

222.    Management of a public company is responsible for ensuring that its financial statements filed with the SEC are accurate and in accordance with GAAP.  Management assumes responsibility for its entire financial reporting process, and it cannot discharge its responsibility to its independent auditor or anyone else outside the company that is involved in the financial reporting process.  As set forth below, the accounting literature describes in very clear terms the different responsibilities between company management and its independent auditor:

(a)    The PCAOB Auditing Standards ("AS") explain that management is responsible for financial reporting.[16]    AS 1001, Responsibilities and Functions of the Independent Auditor, states:

> ***The financial statements are management's responsibility***. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's

---

[16]    The PCAOB is a nonprofit corporation established by Congress to oversee the audits of public companies.  The SEC has authority over the PCAOB.

transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(Emphasis added, para. .03; footnote omitted).

      (b)     The SEC states in Financial Reporting Release ("FRR") 600, Matters Relating to Independent Accountants:

Financial statements filed for the registrant and its subsidiaries have been recognized by this Commission and by public accountants generally as representations of management upon who rests the primary responsibility for their propriety and accuracy.[17]

      (c)     AS 4101, Responsibilities Regarding Filings Under Federal Securities Statutes, paragraph .01 states:

The fundamental and primary responsibility for the accuracy of information filed with the Commission and disseminated among the investors rests upon management.  Management does not discharge its obligations in this respect by the employment of independent public accountants, however reputable. Accountants' certificates are required not as a substitute for managements' accounting of its stewardship, but as a check upon the accounting.

## B.    Definition of Internal Control

223.    SEC regulations in the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Report, Internal Control – Integrated Framework (1993) ("COSO Report") have their own definitions of internal controls.  The 2013 updated COSO Report defines internal control as a process that is "effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."

224.    The definition places emphasis on the following aspects of internal control. Specifically, internal control is: (i) geared to the achievement of objectives; (ii) a process consisting of ongoing tasks and activities; (iii) effected by people and the actions they take at every level within an organization; (iv) able to provide reasonable assurance; and (v) adaptable

---

[17]    FRR 602.02.c.i.

to the entity structure. Furthermore, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

225.   The SEC rules 13a-15(f) and 15d-15(f) define internal control over financial reporting as a:

> process designed by, or under the supervision of, the issuer's principal executive and principal officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

**C.     Molson Internal Control Failures**

226.   Molson disclosed that it used the COSO Report as its internal control framework throughout the Class Period and that it was in compliance with its provisions at the end of 2016 and 2017.  These disclosures were false and misleading.

227.   In 2013, the updated COSO Report defined internal control within a certain framework that consists of five separate components and 17 principles.

228.   The COSO Report requires that financial statements prepared for external use be fairly presented in conformity with generally accepted accounting principles and regulatory requirements.

229.    The five components of an internal control framework necessary to enable a business to achieve its objectives are: control environment, risk assessment, control activities, information and communication, and monitoring.  Molson failed each of these components as discussed below.

### D.    Internal Control Objectives and Components

230.    The COSO Report framework sets forth three categories of objectives which allow organizations to focus on separate aspects of internal control:

> Operations Objectives – these relate to the effectiveness and efficiency of the entity's operations.

> Reporting Objectives – these relate to internal and external financial and non-financial reporting and may include reliability, timeliness, transparency, or other terms as set forth by regulators, standard setters, or the entity's policies.  Financial Statements using objectives set forth by rules, regulations, and external standards (*i.e.* a Form 10-K required to be filed with the SEC).

> Compliance Objectives – these relate to adherence to laws and regulations to which the entity is subject.

### Control Environment

231.    The control environment sets the tone of an organization, which is often referred to as "tone at the top" as established by the board of directors and senior management and provides an atmosphere in which people carry out their responsibilities.  It is the foundation for the other components of internal control and provides structure and discipline to the organization.  Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; and the way management assigns authority and responsibility and organizes and develops its people.

232.    The control environment at Molson was not conducive to maintaining effective internal controls.  The Executive and Director Defendants failed to establish the proper tone for the organization concerning the importance of internal controls throughout the entity.  The oversight role conducted by the Executive and Director Defendants, including the audit

committee, was ineffective as it related to oversight over the process for recording Molson's tax accruals during the Class Period.

## Risk Assessment

233.   Every business faces a number of risks from both external and internal sources that must be evaluated.  Risk assessment requires the identification and analysis of relevant risks to the achievement of the entity's objectives.  As a result of this assessment, management determines how the risks to the organization should be managed.

234.   The Executive and Director Defendants failed to recognize that accounting for the $12 billion Acquisition of MillerCoors was an area that represented a significant transaction and that it was subject to the potential for material misstatement occurring in its Financial Statements.

## Control Activities

235.   Control activities support all the components of internal control.  Control activities are actions established by policies and procedures to help ensure that management directives to mitigate risks to the achievement of objectives are carried out.  Control activities occur throughout the organization, at all levels and in all functions, and include a range of activities as diverse as approvals, authorizations, verifications, reconciliations, reviews of operating performance, security of assets and segregation of duties.

236.   The Executive and Director Defendants failed to reconcile Molson's outside basis relating to its investment in the partnership to the book tax differences in the underlying assets and liabilities within the MillerCoors partnership.

## Information and Communication

237.   Internal communication is the means by which information is disseminated throughout the organization.  It can flow as upward, downward or across the organization.  Relevant information is identified, captured and communicated in a form and time frame that enables people to carry out their internal control responsibilities.  All personnel must receive a clear message from management that control responsibilities are taken seriously.  They must

understand their own role in the internal control system, as well as how their daily activities relate to the work of others.  The Information and Communication component of the COSO Report framework supports the functioning of all components of internal control.  In combination with the other components, Information and Communication supports the achievement of the entity's objectives relevant to internal control and external reporting.

238.   Principal No. 13 of the COSO Report framework states, "The organization obtains or generates and uses relevant, quality information to support the functioning of internal control."  The Executive and Director Defendants failed to use the necessary financial information to prepare the deferred income tax calculation in a timely manner.  The book and tax differences of the underlying partnership assets and liabilities should have been summarized and reconciled to Molson's outside basis in MillerCoors so that the deferred tax calculation could have been prepared in a timely manner.

**Monitoring**

239.   Monitoring an internal control system is a process that assesses the quality of the system's performance over time.  Ongoing monitoring includes regular management and supervisory activities, and other actions personnel take in performing their duties.  Monitoring activities assess whether controls within each of the five components of internal control are operating as intended.

240.   The Director Defendants' oversight over management along with the Audit Committee's oversight of internal control over financial reporting failed in 2016, 2017 and 2018. The Director Defendants also failed to properly assess the effectiveness of the Audit Committee as part of its assessment of internal control over financial reporting.  In this regard, the Director Defendants—including the Audit Committee and the Executive Defendants—failed to assess whether the Company had adequately evaluated the risk environment and the Company's establishment of controls to prevent, deter, and detect risk and fraud, and to monitor Molson's efforts to address any weaknesses in its controls.

E.      Roles and Responsibilities in an Internal Control System

241.    Everyone in an organization has responsibility for internal control.  The Director Defendants and the Audit Committee are responsible for overseeing the actions of management. At Molson, management includes the CEO, CFO, executive officers, senior managers, and managers at various operating and reporting segments within Molson. The CEO sets the "tone at the top" that affects integrity and ethics and other factors of a positive control environment.  The CEO fulfills this duty by providing leadership and direction to senior management and reviewing the way they control the business.   Senior managers, in turn, assign responsibility for establishment of more specific internal control policies and procedures to personnel responsible for the unit's functions.

242.    For effective internal control to provide reasonable assurance of achievement of an entity's objectives each of the aforementioned five components of internal control and relevant principles must be present and functioning, and the five components must be operating together in an integrated company.

243.    Defendants admitted that a material weakness existed in the Company's internal controls over financial reporting as of December 31, 2018.  Specifically, Defendants did not design and maintain appropriate controls over the completeness and accuracy of the accounting for and disclosure of the income tax effects in connection with acquired partnership interests. Defendants failed to identify and reconcile deferred income tax effects of its acquired partnership interests.

244.    A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  AS 2201.A7.

245.    In addition to violating the SEC rules and regulations relating to disclosure controls, Defendants also violated the reporting objectives of COSO during the Class Period. The Company's Financial Statements for the years ended December 31, 2016 and 2017 were

materially false and misleading to the market, investing public and other users.   Defendants reported false and misleading disclosures in the Company's originally issued 2016 and 2017 Forms 10-K that supposedly were in compliance with COSO and SEC regulations, and that there were no material weaknesses when in fact just the opposite was true.

### F.      Other Internal Control Failures

246.      There was a failure at Molson at several levels within the organization.   The responsibility for recording the correct amount of deferred income taxes on Molson's books after the Acquisition during Q4 2016 is shared by the Board, Audit Committee, and Executive Defendants.   Defendants failed to provide the appropriate level of oversight, monitoring and direction to management when it reviewed its tax provision at the end of 2016 and 2017.   The Audit Committee is responsible for reviewing the Company's Financial Statements that are included in the 2016 and 2017 10-Ks.

247.      Defendants failed to identify the areas of the Financial Statements that presented significant risk such that the Financial Statements could be materially misstated.   Defendants failed to implement a risk assessment process that adequately considered risks that may occur. This $12 billion Acquisition, which the market recognized as representing 80% of the Company's earnings, should have been on Defendants' radar as a "high risk" transaction, and they should have ensured that it was recorded in accordance with GAAP with the proper disclosures.   This Acquisition was clearly significant and highly unusual (described as "game-changing" or "historic" by Hunter) in the Company's history and as a result of not treating this transaction as high risk, it was  materially misstated because Defendants either deliberately or recklessly failed to design the appropriate controls that could have decreased the chances of a material misstatement in the financial statements from occurring and failed to ensure that the operating effectiveness of the controls that may have existed were operating as designed.

248.      The fact that it took two years (from the filing of 2016 10-K in February 2017 to filing the 2018 10-K in February 2019) to disclose the misstatement presents another serious internal control weakness.   The failure in internal control is compounded when Defendants

repeated announced that it was "revaluing" its tax liabilities, making the misstatement either deliberately or recklessly not disclosed.

249.    As discussed in ¶¶ 229, 237-238 above, information within an organization must be communicated in a timely fashion in order to be effective.

250.    In a speech given on February 11, 2004 by SEC Chief Accountant Donald Nicolaisen to the Tax Counsel Institute Conference on The Corporate Tax Practice, he stated that "the financial reporting of income taxes is a very significant matter to the heath and credibility of our capital markets . . . . [a]ccurately accounting for the income tax consequences of a company's transactions is critical to the credibility of the financial statements as a whole."  He also described how the CFO should ask the tax professionals to document and test the controls over the recording of the tax effects of a company's transactions.  He stated further, "You should establish a basis upon which to conclude that the processes and procedures in your department are adequate to ensure that the tax consequences of the company's transactions are recorded, reported, and disclosed in a manner that complies with GAAP and the securities laws." The impact of these misstatements on the market and the credibility of the Company's financial statements is significant.

251.    Prior to the Acquisition, Molson's 42% interest in MillerCoors was on the equity method of accounting for its partnership interest.  Since the accounts of an equity method investee are not consolidated into the financial statements of Molson, controls over the recording of transactions into the investee accounts would not be part of Molson's internal control structure.  However, the SEC Staff's response to Question 2 of the SEC internal control FAQs states that "the registrant must have controls over the recording of amounts related to its investment that are recorded in the consolidated financial statements . . . . However, nothing precludes a registrant from evaluating the control over financial reporting of an equity method investment, and there may be circumstances where it is not only appropriate but also may be the most effective form of evaluation."[18]  Certainly, Joubert, MillerCoors' CFO prior to the start of

18       *Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports – Frequently Asked Questions* (revised September

the Class Period, should have performed, or was reckless in not performing, this evaluation and would or should have been aware of the book/tax differences of the underlying assets in MillerCoors.

**G.    Executive Defendants' False Certifications of SEC Filings**

252.    SOX, enacted "to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes," requires the principal executive officer or officers and the principal financial officer or officers of a company to certify to specific responsibilities over financial reporting, disclosures, and internal control over financial reporting.  SOX makes it clear that a company's CEO and CFO are responsible for the Company's publicly filed information, so that investors, who rely on such information for decision-making purposes, can have a higher level of comfort based on the fact that the principal officers of the Company were taking "ownership" of the financial information.

253.    As required by Title III - Corporate Responsibility - Section 302, Corporate Responsibility for Financial Reports, both Hunter as CEO and Joubert as CFO certified the Company's 10-Qs and 10-Ks and admitted that they are responsible for disclosure controls and procedures and have evaluated and reported on such controls and procedures.

254.    Contrary to these certifications by the Defendants, in a restatement footnote in the 2018 10-K, the Company admitted that its internal control over financial reporting was not effective as of December 31, 2018, and the Executive Defendants both admitted that their disclosure controls and procedures were not effective as of December 31, 2018.

255.    The term "disclosure controls and procedures" means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by anissuer in the reports that it files or submits under the Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.[19]  Item 307

---

24, 2007), SEC, http://sec.gov/info/accountants/controlfaq.htm (last visited Dec. 9, 2019).  The answers to these frequently asked questions represent the views of the staffs of the Office of the Chief Accountant and Division of Corporate Finance.

[19]     Exchange Act Rules 13a-15(e).

of Regulation S-K requires disclosure of the conclusion of the CEO and CFO regarding the effectiveness of disclosure controls and procedures.

256.    Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.[20]

257.    In the 2018 10-K, Defendants admitted that the disclosures identified herein were false and misleading.  Title IX - White Collar Crime Penalty Enhancements - Section 906, Corporate Responsibility for Financial Reports, requires that the principal officers certify, in both the company's 10-Qs and 10-Ks, that the financial statements comply with applicable securities laws and fairly present the financial condition and results of operations of the company.   Both Hunter and Joubert signed certifications for the 2016 and 2017 years that were false and misleading.

**Violations of SEC Rules and Regulations**

258.    In addition, Defendants caused Molson to violate Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  For over eight quarters, Molson failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting and reconciling the books and records of the entities consolidated in its financial statements.  In fact, despite knowing about the Company's lack of adequate internal controls, Defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in Molson's internal accounting controls and falsely asserted that its consolidated financial statements complied with GAAP.

---

[20]     SEC August 29, 2002 Release No. 33-8124, *Certification of Disclosure in Companies' Quarterly and Annual Reports*; *see also* August 14, 2003 SEC Release No. 33-8238, *Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*.

259.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements.  *See* FASB Statement of Concepts No. 1, ¶ 7.  For this reason, in addition to Molson's failure to make the required disclosures in its financial statements and in its SEC filings, Molson also shirked its duty to make such disclosures in its conference calls, its press releases and its 10-Ks.

260.    As Defendants allowed and were responsible for the gross lack of internal controls over financial reporting which resulted in materially misstated financial statements, Defendants were enabled to engage in a fraudulent scheme which inflated stock prices through accounting improprieties.

## X.    CLASS ACTION ALLEGATIONS

261.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Molson's Class B Common stock between February 14, 2017 and February 12, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, directors and affiliates of the Company at all relevant times, members of their immediate families, voting trusts of the officers and directors and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest.

262.    Because Molson has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  As of February 7, 2019, Molson had 196,042,622 shares of Class B Common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class that are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by Molson or its transfer agent, and may be

notified of the pendency of this action by mail or electronic mail, using the form of notice similar to that customarily used in common stock class actions.

263.    Lead Plaintiffs' claims are typical of the claims of the members of the Class because Lead Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

264.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in shareholder class litigation. Lead Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

265.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

266.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)      whether Defendants violated federal laws as a result of Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and misrepresented material facts about the business, operations, and prospects of Molson;

(c)      whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether the market prices of Molson's Class B Common stock during the Class

Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(e)       whether the members of the Class have sustained damages as a result of the decline in the value of Molson's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## XI.   UNDISCLOSED ADVERSE FACTS

267.   The market for Molson's Class B Common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Molson's Class B Common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Molson's Class B Common stock relying upon the integrity of the market price of the Company's Class B Common stock and market information relating to Molson, and have been damaged thereby.

268.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Molson's Class B Common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Molson's business, financial statements, financial reporting, adequacy or effectiveness of internal control over financial reporting, and the Company's prospects as alleged herein.

269.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Molson's financial reporting, adequacy of its internal controls and consolidated financial statements, and the success of the Acquisition.  These

material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, thus causing the Company's Class B Common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's Class B Common stock at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XII.   LOSS CAUSATION

270.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.

271.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Molson's Class B Common stock, by publicly issuing false and misleading statements and omitting material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

272.   At all times, the material misrepresentations and omissions particularized in this Complaint, directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of false and misleading statements about Molson's financial reporting, adequate internal controls and consolidated financial statements and the success of the Acquisition.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Molson and its business, and financial statements, thus causing the Company's Class B Common stock to be overvalued and artificially inflated at all relevant times.  When Defendants disclosed at the end of the Class Period that: (1) the Company's consolidated financial statements could no longer be relied upon, and in fact, contained material misstatements; and (2) the Company's internal financial controls were inadequate, the stock dropped immediately by almost 10%.  Neither the assumptions nor the deficiencies with those

assumptions were disclosed until that time. When they were finally disclosed, the market reacted quickly and the stock dropped as a result. In other words, when the truth about Defendants' wrongful acts, including the delayed announcement of misstated financial statements, lack of adequate internal control over financial reporting and material weakness therein was revealed, the artificial inflation of the stock price that Defendants caused during the Class Period was removed. Thus, Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's Class B Common stock at artificially inflated prices, thereby causing the damages complained of herein.

273. During the Class Period, Lead Plaintiffs and the Class purchased Molson's Class B Common stock at artificially inflated prices and were damaged thereby.

## XIII. <u>FRAUDULENT SCHEME AND COURSE OF BUSINESS (SCIENTER)</u>

274. Defendants participated in a scheme to defraud and committed acts, practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Molson Class B Common stock during the Class Period. The fraudulent scheme: (i) deceived the investing public for two years about Molson's consolidated financial statements, the impact of the Acquisition on Molson's books and records, and the adequacy and effectiveness of the Company's internal controls over financial reporting; and (ii) caused Lead Plaintiffs and other Class members to purchase Molson Class B Common stock at artificially inflated prices, causing them damage. During the Class Period, as alleged herein, the Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged above were materially false and misleading; and (ii) such statements and omissions would deceive investors into purchasing Molson Class B stock at artificially inflated prices.

### A. Molson's Materially False and Misleading Financial Statements Result of its Fraudulent Accounting Schemes

275. Defendants caused Molson to employ several improper accounting schemes, in violation of GAAP and SEC guidance, including a failure to reconcile the outside basis of its investment in the MillerCoors' partnership with the underlying assets and liabilities that were on the books of the partnership. Doing so effectively understated Molson's income tax expense and

deferred tax liabilities and overstated its net income, earnings per share and retained earnings for nearly two years across the Company's various financial statements. Once the Acquisition was complete, Defendants repeatedly evaluated and 'revalued' the Acquisition's alleged tax benefits and even then, repeatedly promoted the Acquisition's tax benefits to the investing public. Defendants' fraudulent accounting scheme resulted in a failure to book a material $399 million deferred income tax liability thereby *understating Molson's deferred tax liabilities by 23% in FY 2016 alone* - and a failure to identify this substantial understatement in its deferred tax liability for almost two years.

276.    In Q4 2016, Molson acquired 100% of MillerCoors, referred to herein as the Acquisition, for $12 billion.  In Earnings Releases and Earnings Calls, Hunter characterized the Acquisition as "historic" and "game-changing" and stated that it accounted for almost 80% of the Company's earnings. ¶¶ 75, 77, 78, 81, 84, 88.  The assets and liabilities acquired consisted of property, plant and equipment, software, returnable containers, construction in progress, inventories, receivables, intangible assets such as brands, distribution rights, naming rights and favorable contracts. ¶ 98.  Some or all of these substantial assets had differences between their tax basis (used for the tax returns) and book basis used for financial reporting. In consolidating and integrating these assets and liabilities as part of the consolidated financial reporting process, Defendants had an obligation under the relevant GAAP and SEC guidance to reconcile these book-tax differences in these assets and liabilities.

277.    On at least four occasions over almost a two year period (¶¶ 88, 103, 115, 160), Defendants repeatedly announced due diligence analysis, evaluations and revaluations of tax liabilities and income benefits, and had an obligation to undertake those announced steps and had to know, or were reckless in not knowing, the book-tax differences associated with MillerCoors' assets and liabilities.  The repeated issuance of these statements by the Executive Defendants gives rise to a strong inference of scienter.

278.    Prior to the Acquisition, when MillerCoors was a joint venture between Molson and SABMiller, Defendant Joubert was the CFO and VP of MillerCoors from 2012 to 2016.

Approximately 30 days after the Acquisition was completed, Joubert suddenly became the Molson CFO, taking over when the prior Molson CFO left just six months.  Defendant Hunter, Defendant PH Coors and Molson senior executives all served on the MillerCoors Board before the Acquisition.  This was not the usual integration and consolidation of two separate and distinct companies which could create some unknown risks, but the integration of a jointly held asset about which the Defendants had either day to day or detailed insider knowledge.

279.    Molson treated MillerCoors as a partnership and recorded its share of the income from MillerCoors under the equity method which would have been different from the income or loss from the partnership that was reported on its K-1 forms for tax purposes.  After the Acquisition, when the partnership tax returns for the 2016 and 2017 years were prepared (the partnership was not liquidated until 2018), the returns would have included the assets and liabilities that were on the partnership books prior to the Acquisition.  Defendants had access to the partnership tax returns either from preparing or reviewing them and thus would have had direct knowledge that the tax basis of these assets was different than their book basis and should have at that time reconciled its outside basis for its investment in the partnership to the book-tax differences in the underlying assets and liabilities within the partnership and thus recognized the need for recording deferred income taxes on Molson's books.

280.    When preparing the partnership tax returns in for 2016 and 2017, the tax basis of the newly acquired assets would have been used to calculate tax depreciation, amortization, possible inventory write-offs, and possible bad debt write-offs.  Defendants had access to this information either through their audit or management functions, and the Executive Defendants, either directly or through their senior management, would have seen this information, or been informed of this information, in preparing the returns or reviewing them.  By turning a blind eye to these facts, Defendants were able to orchestrate a fraudulent scheme *which overstated net income by 20% and understated deferred tax liabilities by 23% for FY 2016.*

281.    Given their insider access to or knowledge of the 2016 and 2017 partnership tax returns, these errors were or should have been obvious to the Executive and Director Defendants.

Notably, this almost $400 million misstatement should have been especially obvious to certain Individual Defendants given their background with Molson or MillerCoors, including Joubert (MillerCoors' prior CFO and Molson's current CFO), Hunter (MillerCoors' former director and Molson's CEO), PH Coors (Molson's director with previous executive experience at Coors and Molson), and GE Molson (Molson senior management).

282.    These are the same insider Defendants who benefited from stock sales during the Class Period at inflated stock prices.  On January 16, 2018, PH Coors sold 4,118 shares of Class B Common stock on the open market for proceeds of $250,058.83.  The following day PH Coors sold an additional 51,485 shares of Class B Common stock for $4,376,858.27, for total proceeds of $4,726,917.20 during the Class Period.  On May 31, 2018, Hunter sold 2,070 shares of Class B Common stock on the open market for proceeds of $126,800.08.  On January 1, 2017, Joubert sold 1,000 shares of Class B Common stock on the open market for proceeds of $79,153.20. Together the Executive Defendants and PH Coors sold almost $5 million worth of Class B Common stock during the Class Period.[21]

283.    In addition, during the Class Period, all members of the Board were charged with oversight and dedication of resources to implement "appropriate systems to manage the principal risks" of the Company's business, as well as with regularly reviewing reports from the Audit Committee and management reports on "the Company's most material risks and the degree of exposure to those risks."  *See* 2016 Proxy at 28; 2017 Proxy at 33; 2018 Proxy at 31.  More specifically, the Audit Committee Defendants bore responsibility for overseeing risks relating to financial reporting, internal controls and compliance—all of which were implicated by these accounting errors.  The Audit Committee either knew about this failure to reconcile the book-tax differences or were dangerously reckless in having missed these issues given that Molson's Board touted their specialized financial knowledge as independent and "financially literate," and specifically labeled Eaton and Hobbs as "audit committee financial experts."  *See* 2016 (at 33),

---

[21]    The Executive and Director Defendants also disposed of over $11 million worth of Class B Common stock that was withheld by Molson to cover the exercise price of the stock and to cover tax withholding obligations.

2017 (at 36), and 2018 Proxies at 34.  *See also* ¶¶ 29, 37 (Eaton holds accounting certifications DeVita is CEO of a fintech advisory practice).

284.    Both the Audit Committee and Board were tasked with oversight of risk management and Company procedures for monitoring and controlling such risks, as well as "the integrity of the Company's financial reporting process and the Company's financial statements." 2016 Proxy at 33; 2017 Proxy at 35 and 2018 Proxy at 33.  The members of the Finance Committee, Defendants Hobbs, Napier and Vachon were also tasked with monitoring "the Company's financial, hedging and investment policies and strategies, as well as the Company's *tax strategies*" in order to "carry out its primary purposes." *See* Charter at http://www.molsoncoors.com/-/media/molson-coors-corporate/policies/finance-committee-charter.ashx?la=en.  *See also* 2016 Proxy at 28, 34-35; 2017 Proxy at 36; 2018 Proxy at 34 (same).  Between these obligations, their financial sophistication, including expertise as to auditing and accounting, and the SOX certifications by Defendants Hunter and Joubert as to disclosure of any internal control issues to the Audit Committee, the Director Defendants must have known of the misconduct at issue.  Defendants thus had access to and were aware or were deliberately reckless in not knowing the book-tax differences associated with these assets and liabilities.

285.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the underlying book-tax differences in MillerCoors' underlying assets and liabilities, their control over, and/or receipt and/or valuation or revaluation of MillerCoors' deferred tax liabilities, modification of Molson's materially misleading financial statements and/or their association with both Molson and  MillerCoors which made them privy to confidential proprietary information concerning MillerCoors, participated in the fraudulent scheme.

286.    Assuming *arguendo* that the Defendants did not have direct knowledge of the book-tax differences related to the underlying assets and liabilities of MillerCoors, Defendants were dangerously reckless because the danger was known or so obvious that Defendants must

have been aware and were on notice of potential accounting issues associated with the Acquisition because of the following red flags:

(a)      MillerCoors had been the subject of *a DOJ accounting fraud investigation* which resulted in a criminal plea by a senior sales executive who stole almost $8 million through fraudulent invoices, an indication of financial reporting and accounting weaknesses (¶¶ 61-62).

(b)      Molson had *four* CFOs and even a "consultant CFO" just in the one year before the Acquisition closed, a red flag in reviewing the effectiveness and robustness of internal controls in financial reporting (¶¶ 18, 60, 91);

(c)      the sheer magnitude of this historic $12 billion Acquisition combined with the following:  (i) repeated public disclosure of the allegedly substantial and critical "Acquisition cash tax benefits;" (ii) repeated assurances that the tax benefits and liabilities of MillerCoors were continually evaluated, revaluated and subject to due diligence by the Company; and (iii) the presentation of this information to the market was either questioned by market analysts who were "puzzled" as to why this extraordinary and discrete tax benefit was not part of the financial reporting structure for tax liabilities and benefits provided in the Company's financial statements (¶¶ 71, 76, 87, 88, 103, 110, 111, 113, 115, 139, 142, 160, 299);

(d)      the sheer magnitude of the misstatement - nearly $400 million in FY 2016 – which means that Defendants *understated the Company's tax expense by a whopping 38% and understated deferred tax liabilities by 24%* (¶ 212); and

(e)      during the Q1 2017 Earnings Call, a market analyst asked for "insight" about "the transaction tax question" and whether the "cash tax expectation" associated with the Acquisition would be included in the "normal tax charge" to which the Defendant Executives responded that "they would ponder that perspective and feedback" and "decide whether there is anything we would want to do differently," putting Defendants on notice that the market questioned the underlying financial reporting of the Company's income tax benefits (¶ 113).

287.   As discussed herein in more detail, because of their executive and Board position(s), interaction with the market analysts, and insider knowledge about MillerCoors, there

is a strong inference that the Defendants knew the facts or had access to information suggesting that their public statements were not accurate, or failed to check information that they had a duty to monitor.  In light of the material importance of the Acquisitions' tax benefits and liabilities to both Molson's financials and to investors and the market, their proper determination was clearly critical during the Class Period and Defendants either knew about the material weakness in the Company's financial reporting or knew facts that made the risk of material weakness and falsity in financial statements obvious.

**B.      Molson's Financial Restatements Establish Scienter**

288.    As a result Defendants' accounting shenanigans, alleged herein throughout the Class Period, Molson was ultimately forced to restate its previously released financial statements for FY 2016 and FY 2017 to comply with GAAP and SEC guidance.  This adjustment was material and substantial and encompassed eight consecutive quarters.  The fact that the Company was forced to restate its financials and the sheer magnitude of such a restatement - ***$400 million in FY 2016, a stunning 38% understatement of Molson's income tax expense and 24% understatement of deferred tax liabilities - is, in and of itself, probative of scienter.***  *See* ¶¶ 5, 108.

289.    For example, in FY 2016, net income was overstated by ***20% in Molson's Consolidated Statement of Operations***.  In FY 2016, Molson reported a basic net income per share of $9.40, but ***the actual per share value was only $7.52, a misstatement of 20%.***  *See* ¶¶ 5, 108.  These misstatements substantially increased the 'book' value of Molson's critical $12 billion Acquisition.

290.    The fact that Molson adjusted its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading; and (ii) the financial statements reported during the Class Period were incorrect based on information available to the Defendants at the time the results were originally reported.

291.    The adjustment at issue was not due to a simple mathematical error or honest

misapplication of an accounting standard or oversight.  It was due to misuse of the facts.  As alleged herein, Molson knew that upon the closing of the Acquisition and the completion of the deferred income tax calculations associated with the re-measurement of the equity interest in MillerCoors, the outside deferred income tax liability must also be reconciled.  Despite this knowledge, Molson did ***not*** make the required adjustments to correct the financial statements because they would have decreased net income, reducing retained earnings per share and adversely affected the stock price.

292.    Further, the improper accounting corrected by this adjustment did not occur as a result of good faith differences in accounting judgments.  For example, the improper accounting has nothing to do with accounting estimates such as that required to calculate impairments or bad debt reserves.  The rules about recording deferred income taxes are not subject to judgments or accounting estimates.

293.    The discrete nature of the accounting errors also gives rise to strong inference of scienter.  Moreover, it is more than sheer coincidence that the adjustment had the effect of increasing, not reducing, the income tax expense, and decreasing net income, earnings per share, retained earnings and total equity, just after a critical acquisition in which Defendants repeatedly touted the tax benefits and repeatedly assured the market that this benefit/liability had been analyzed, evaluated and revaluated throughout the Class Period.

294.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the financial statements which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in the Complaint could not have been perpetrated over the alleged period of time, as occurred here, without the knowledge and complicity of the personnel at the highest level of the Company, including the Executive and Director Defendants.

295.    Because of their positions and access to material non-public information available to them, and because of their previous senior executive, management or Board positions at MillerCoors and/or their current or prior executive positions, management or Board positions at Molson (or its predecessors), the Defendants knew that the adverse facts relating to the false

financial statements had not been disclosed to, and were being concealed from, the public, and that the positive representations otherwise being made to the public, were thus materially false and/or misleading.  Defendants, because of their positions of control and authority, as officers and/or directors of the Company, were able to and did control the contents of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

296.    All of the Defendants signed the 2016, 2017 and 2018 10-Ks which either contained false and misleading financial statements (2016 10-K and 2017 10-K) or admitted that the prior financial statements were false and needed to be restated, internal controls were neither adequate nor effective and prior financial statements should not be relied upon (2018 10-K).  Accordingly, each Defendant is responsible for the accuracy of the public reports and releases issued and is, therefore, primarily liable for the representation contained therein. Each of the Defendants is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on the purchasers of Molson's Class B Common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

### C.     Additional Scienter Allegations

297.    The timing and circumstances of the many "retirements," "resignations" and terminations of Molson's various executives adds further weight to the overall inference of scienter.  There were at least four different CFOs just prior to the start of the Class Period. ¶¶ 18, 60.  On January 31, 2018, Molson's Chief Legal Officer gave notice that he would retire, effective February 28, 2019. ¶ 68 n.9.  On July 31, 2019, a few months after the announced misstatements and weakness in internal controls, the Company announced that the CEO, Defendant Hunter, would "retire."   On October 30, 2019, Molson's Chief Supply Chain officer announced his retirement; and two weeks later, Molson's Principal Accounting Officer also

announced that he would cease his services at a future date.  ¶¶ 68 n.9, 114 n. 13.

298.   Scienter is further supported by Defendant Joubert's extensive background in financial management, including technical accounting, and specifically with regard to the financial planning and analysis at MillerCoors, where she served as VP of Finance, Planning & Analysis and Controller from its formation in 2008 until 2012, and then as its CFO and VP until she became Molson's CFO in November 2016.  Given her position as CFO, her accounting background, and her prior experience at MillerCoors, Defendant Joubert possessed the knowledge of the nature of the assets and liabilities that were on the books of the MillerCoors partnership including the book/tax differences that existed within such assets and liabilities and had the power and authority to control the contents of Molson's reports to the SEC, press releases and presentations to the market.

299.   Defendant Joubert also made repeated and specific statements to the market regarding the company's expected tax rate as well the "cash tax benefits" related to the MillerCoors' Acquisition.  *See* TAP Q1 2017 (Bloomberg) Tr. at 5.  As CFO, Joubert reviewed, approved, signed and certified the SEC filings which contained the false financial statements (*see e.g.,* ¶ 52) and spoke directly with market analysts about the Company's financial highlights.  Therefore Defendant Joubert had the ability and opportunity to prevent their issuance or cause them to be corrected.

300.   As Molson's President and CEO, Defendant Hunter similarly monitored, reviewed, approved and signed the Company's SEC filings prior to their filing and dissemination to the public.  In fact, he repeatedly made specific statements regarding the tax benefits of the Acquisition that specifically demonstrate his knowledge of the tax deferred liabilities and deferred tax expense that necessitated the Company's restatement.  For Defendant Hunter to participate in earnings calls and review Molson's "Financial Headlines" as he did (*see e.g.,* paragraph 64 above), he clearly possessed the power and authority to control the contents of Molson's reports to the SEC, press releases and presentations to the market.

301.   The timing and weight of Hunter's sudden departure from the Company after 30

years with Molson and its predecessor Bass Brewers and only one full quarter after the restatement and material weakness disclosures also adds weight to the overall inference of scienter.

302.    The Executive Defendants repeatedly reiterated the effectiveness of the Company valuing and revaluing the tax benefits associated with the Acquisition and reassuring analysts of the adequacy of their internal control process for financial accounting for this substantial impact on the Company's financial statements.  As here, when a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to a strong inference of scienter.

303.    Scienter is further supported by the specific statements Defendant Hunter personally made regarding the Acquisition, such as how "this transformation of our company offers unique opportunities for us to drive cash generation through substantial tax benefits," and his references to the "detailed tax diligence work that we've completed during the past year." *See* ¶¶ 88, 89. His statements to the market and his position as President and CEO indicates that he must have participated in the review and creation of the Company's SEC reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and as such, also had the ability and opportunity to prevent their issuance or cause them to be corrected.

304.    In addition, as discussed herein, on two separate occasions, the Executive Defendants were made aware of problems with the Company's tax accounting related to the Acquisition, while repeatedly touting its purported tax benefits.

305.    On the Q1 2017 Earnings Call, when both of the Executive Defendants were walking the market analysts "through highlights," an analyst questioned the tax benefit calculation and noted that the cash tax benefit was "a very considerable swing factor in [Molson's] likely reported earnings."  *See* TAP Q1 2017 (Bloomberg) Tr. at 14.  In response to an analyst inquiry about taxes associated with the Acquisition, Joubert reiterated the "cash tax benefit would be around $275 million on average over 15 years [and] … nearly $390 million in 2017."  Defendant Hunter then refuted any suggestion that they were doing anything other than

"reporting transparently how our business is performing." *Id.*

306.   When a market analyst questioned Defendants' calculations, particularly in comparison to "competitors who have also had sort of time-delineated tax benefits [and] have just taken that as part of the normal tax charge rather than as effectively and as exceptional item," Hunter made false promises to "ponder that perspective and feedback and then decide whether there is anything we would want to do differently." *Id.* at 14.   Having market analysts specifically question the underlying tax accounting for the Acquisition means that the Executive Defendants knew or were reckless in not knowing, the tax accounting relevant to the Acquisition was false and misleading.

307.   The misstatement should have come to Executive Defendants' attention given their admitted "evaluation" and "revaluation" of the tax accounting related to the Acquisition. As stated in the Q4 2017 Earnings Release, "Our effective tax rate was negative 195.0 percent in the fourth quarter of 2017, and was driven by the recognition of a net discrete tax benefit related ***to revaluing our deferred tax liabilities*** as a result of the reduction of the federal statutory corporate income tax rate to 21 percent as part of U.S. tax reform."

308.   Despite the continual and public statements relating to the valuation and revaluation of the Acquisition's tax treatment, Defendants either intentionally or recklessly chose to perpetuate the Company's false and misleading financial statements with only the highly beneficial cash tax benefits.   These facts further support a finding of scienter as to each of the Executive Defendants.

309.   The Executive Defendants each signed false and misleading 10-Ks and 10-Qs that perpetuated the false and misleading financial statements for eight consecutive quarters.   Both Hunter and Joubert represented that the Company's disclosure controls and procedures were effective as required by Section 404 of the Sarbanes-Oxley Act of 2002. *Id.*   The Executive Defendants also provided Section 302 Certifications (attached to 10-Qs) attesting that as CFO and CEO, the 10-Q "does not contain any untrue statement of material fact." *See* ¶¶ 52, 55, 106, 107, 120, 121, 134, 135, 146, 147, 152, 156, 170, 171, 183, 184, 193, 194, 257, 296, 299, 300,

309, 313, 322, 323, 334 (detailing the various certifications by Defendants Hunter and Joubert attached to the 10-Ks and 10-Qs from 2017 through 2018).

310.   It is appropriate to treat the Executive Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete financial information conveyed in the Company's public filings, press releases and other publications alleged are the collective actions of the Executive Defendants.   Each of Molson's officers, by virtue of their high-level positions with the Company as CEO and CFO directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, books and records, financial statements and financial condition.   These Defendants were involved in drafting, producing and reviewing and/or disseminating the false and misleading statements and information alleged, were aware, or recklessly disregarded, that the false and misleading financial statements were being issued by the Company, and approved or ratified these statements, in violation of the federal securities laws.

### D.      Inadequate and Ineffective Internal Control

311.   Defendants are responsible for establishing and maintaining adequate internal control over financial reporting according to the Company's SEC filings, Audit Committee Charter and other related Company documents.   *See* ¶¶ 45-53, 107, 120, 121, 134, 135, 146, 147, 153, 154, 158, 170, 171, 183, 184, 193, 194, 221-226, 231, 232, 241, 246.   As discussed repeatedly herein, the Company reiterated again and again these responsibilities regarding the Board, the Audit Committee and management, especially the CEO's and CFO's responsibilities. *Id.*   As discussed above, the SEC and GAAP both provide guidelines for establishing and maintaining adequate internal control over financial reporting.

312.   Executives of public companies committed to reporting accurate financials do not allow a material weakness in internal controls to exist, let alone remain unremediated for eight consecutive quarters.   Moreover, the existence and persistence of the material weakness during the Class Period did, or should have, put the Defendants on high alert that their statements to investors had a high likelihood of being false and misleading.   To avoid such false statements,

their statements and disclosures should have been monitored very closely by management and the Board of Directors.  The Defendants' failure to institute effective controls throughout the Class Period and to allow a material weakness to persist for eight consecutive quarters further strengthen the inference that Defendants knew, or were deliberately reckless in not knowing, of their misstatements and omissions.

313.    As discussed above, the Executive Defendants signed Sarbanes-Oxley certifications and had reason to know or should have suspected due to the glaring accounting red flags and irregularities that the financial statements contained material misstatements and omissions.

314.    The Company's 10-Qs explicitly touted the personal interest and participation of the Executive Defendants in evaluating the effectiveness of the Company's internal controls. The discrepancies between the admissions in the February 2018 restatements and the repeated certifications that continued from the beginning of the Class Period until November 2018 are stark and give rise to scienter.

## XIV.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

315.    The market for Molson's Class B Common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Molson's Class B Common stock traded at artificially inflated prices during the Class Period.   Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's Class B Common stock relying upon the integrity of the market price of Molson's Class B Common Stock and market information relating to Molson, and have been damaged thereby.

316.    During the Class Period, the artificial inflation of Molson's Class B Common stock was caused by the material misrepresentations and/or omissions detailed in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Molson's consolidated financial statements, deferred

tax liabilities and net income. These material misstatements and/or omissions created an unrealistically positive assessment of Molson and its business, operations and prospects, thus causing the price of the Company's Class B Common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's Class B Common stock at such artificially inflated prices, and each of them has been damaged as a result.

317.   At all relevant times, the market for Molson's Class B Common stock was an efficient market for the following reasons, among others:

(a)   Molson's Class B Common stock met the requirements for listing, was listed and actively traded on the NYSE, a highly efficient and automated market with a moderate to large weekly trading volume;

(b)   As a regulated issuer, Molson filed periodic public reports with the SEC and/or the NYSE; Molson regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)   Molson was covered by multiple stock analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly-available and entered the public marketplace; and

(d)   Molson has a historical showing of immediate movement of the stock price in response to unexpected corporate events or financial releases.

318.   As a result of the foregoing, the market for Molson's Class B Common stock promptly digested current information regarding Molson from all publicly-available sources and reflected such information in Molson's stock price.  Under these circumstances, all purchasers of

Molson's Class B Common stock during the Class Period suffered similar injury through their purchase of Molson's Class B Common stock at artificially inflated prices and a presumption of reliance applies.

319. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims can be characterized primarily as omissions or misrepresentations. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – the allegations herein can be fairly characterized as omissions, dictating that positive proof of reliance is not a prerequisite to recovery.

## XV.   NO SAFE HARBOR

320. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Molson's who knew that the statement was false when made.

## XVI.   ADDITIONAL CONTROL-PERSON ALLEGATIONS

321. As detailed above, each of the Individual Defendants was a "controlling person" of Molson during the Class Period within the meaning of Section 20(a) of the Exchange Act.

322.     Until his retirement shortly after the restatement, Defendant Hunter served throughout the Class Period as President and CEO, and thus was intimately involved in the day-to-day management of the Company and bore responsibility for the truthfulness and accuracy of the Company's financials and other statements.   Among other things, Hunter signed SOX certifications included in SEC filings by the Company attesting that, to the best of his knowledge, the report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" and "the financial statements, and other financial information contained in this report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company.   *See* ¶¶ 120, 134, 146, 157, 170, 183, 193, 309, *supra*.   Hunter made numerous other statements on Molson's behalf during the Class Period.   *See* § VI, *supra*.   Additionally, as detailed throughout this Complaint, Hunter directly participated in, knew of or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act.

323.     Defendant Joubert served throughout the Class Period as CFO of Molson, was intimately involved in the day-to-day management of the Company, and thus also bore responsibility for the truthfulness and accuracy of the Company's financials and other statements.   Among other things, Joubert signed SOX certifications included in SEC filings by the Company attesting that, to the best of her knowledge, the report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" and "the financial statements, and other financial information contained in this report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company.   *See* ¶¶ 120, 134, 146, 157, 170, 183, 193, 309, *supra*.   Joubert also made numerous other statements on Molson's behalf during the Class Period.   *See* § VI, *supra*.   Joubert accordingly is liable under Section 20(a) as a "controlling person" of Molson, which is a primary violator of the securities laws, as detailed in this

Complaint.

324.    Defendants DeVita, Eaton, Herington and Hobbs all served throughout the Class Period as directors of Molson as well as members of the Board's Audit Committee.  Further, Molson's Board touted each of them as independent and "financially literate," and Eaton and Hobbs specifically as "audit committee financial experts."  *See* 2016 Proxy at 33, 2017 Proxy at 36, and 2018 Proxy at 34.  In addition, each of the members of the Audit Committee have specialized knowledge as to finance.  For example, Defendant DeVita is CEO of a fintech advisory practice (*see* ¶ 29), while Eaton holds accounting certifications.  *See* ¶ 37.

325.    As described above, Defendants DeVita, Eaton, Herington and Hobbs (as well as Napier in 2016) submitted the Report of the Audit Committee included in Molson's 2016, 2017 and 2018 Proxy Statements, which contained false or misleading statements of material fact.  *See* ¶¶ 50, *supra*.  As members of Molson's Board and the Audit Committee, the Audit Committee Defendants were charged with overseeing the Company's risk exposure.

326.    Defendants Hobbs, Napier and Vachon were also all members of the Finance Committee.  Per its Charter, the Finance Committee is tasked with monitoring "the Company's financial, hedging and investment policies and strategies, as well as the Company's tax strategies" in order to "carry out its primary purposes."  *See* http://www.molsoncoors.com/-/media/molson-coors-corporate/policies/finance-committee-charter.ashx?la=en.

327.    As the Proxy Statements provided, Audit Committee reports were "regularly sent to the Board" and the Committee (along with the Board), was specifically tasked with "oversight and monitoring of the Company's ERM [Enterprise Risk Management] Program" including an "annual review of the risks, actions and progress."  2016 Proxy at 28, 33.  *See also* 2017 Proxy at 33 (listing "[o]versight of the management of our major financial risks and the steps management has taken to monitor and control such risks").  Further, the Audit Committee — on which Defendants DeVita, Eaton, Herington and Hobbs (and Napier during 2016) served during the Class Period, was also tasked with "[o]versight of the management of the Company's major financial risks and its procedures for monitoring and controlling these risks" and required to

"[m]onitor and oversee the Company's internal controls and internal audit function" and "the integrity of the Company's financial reporting process and the Company's financial statements." *Id.*; *see also* 2017 Proxy at 33, 35 and 2018 Proxy at 31, 33 (same).

328.    Given their positions as directors and members of the Audit Committee of Molson's Board (including Eaton and Hobb's status as an "audit committee financial expert"), the Audit Committee Defendants bore responsibility for overseeing risks relating to financial reporting, internal controls, and compliance—all of which were implicated by the misconduct detailed in this Complaint.

329.    In addition, the Proxy Statements provided that the Finance Committee, of which Defendants Hobbs, Napier and Vachon were all members during the Class Period, is tasked with "[o]versight of the financial matters and the risks related to the Company's…taxes" as well as "monitoring the company's financial condition."  2016 Proxy at 28, 34-35.  *See also* 2017 Proxy at 36 (charging the Finance Committee with "overseeing and reviewing our financial position and policies," including as related to "tax strategies"); 2018 Proxy at 34 (same).

330.    In addition, the Company provided in SEC filings that the Board itself was tasked with oversight of and ensuring the dedication of resources and "implementation of appropriate systems to manage the principal risks" of the Company's business, as well as with regularly reviewing reports from the Audit Committee along with management reports on "the Company's most material risks and the degree of exposure to those risks."  *See* 2016 Proxy at 28; 2017 Proxy at 33; 2018 Proxy at 31.

331.    Several of the Director Defendants (PH Coors, PJ Coors), have served both as a director and in a number of different executive and management positions for Adolph Coors Company, Coors Brewing Company and Molson over the years, providing them each with a longstanding knowledge of the Company and the duties of management and directors.  The other Director Defendants all have business expertise that makes them highly financially literate given their backgrounds: Defendants Ferguson-McHugh (a company president with an MBA), Napier (a chartered accountant with an advanced business degree), Herington (wide ranging executive

experience and formerly a Coors director), AT Molson (a business consultant and attorney), GE Molson (a business expert with experience at Molson), Tough (an experienced business person), Riley (touted in the 2019 Proxy among others, for his "financial expertise") and Vachon (a CFA with other financing qualifications).   Given their financial expertise, including backgrounds within the Company and/or industry in general, the Director Defendants must have had a clear understanding of their duties and obligations as members of the Board all implicated by the misconduct detailed herein.

332.    As provided in their Section 302 Certifications with the Company's 10-Ks pursuant to SOX, both Defendants Hunter and Joubert also stated that they had disclosed:

> [B]ased on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Exs. 31.1 and 31.2 to 2016 10-K, 2017 10-K and 2018 10-K.   As such, Defendants Hunter and Joubert certified that they had disclosed to the Audit Committee Defendants the status of the Company's internal controls and any associated material weaknesses.

333.    In addition, Defendants Hunter and Joubert provided in their Section 906 Certifications pursuant to SOX with the Company's 10-Ks, that:

> a) The Annual Report on Form 10-K of the Company for the year ended December 31, 2017 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> b) the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

2017 10-K, Ex. 32.  *See also* 2016 10-K, Ex. 32; 2018 10-K, Ex. 32.

334.     Each of the Individual Defendants signed the false and misleading financial statements filed with the SEC.  *See* ¶ 52, *supra*.  This combined with all of the Individual Defendants' responsibilities and activities at Molson therefore demonstrates that they had the ability to control and influence the Company.

## XVII.  <u>CAUSES OF ACTION</u>

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule l0b-5 Promulgated Thereunder**
<u>**Against Molson and the Executive Defendants**</u>

335.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

336.     During the Class Period, Molson and the Executive Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Molson's Class B Common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Molson, the Executive Defendants, and each Executive Defendant, took the actions set forth herein.

337.     Molson and the Executive Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class B Common stock in an effort to maintain artificially high market prices for Molson's Class B Common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

338.     Molson and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about Molson's financial well-being and prospects, as specified herein.

339.    Molson and the Executive Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Molson's value and performance and continued substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Molson and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  In doing so, Defendants engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class B Common stock during the Class Period.

340.    Each of the Executive Defendant's primary liability and controlling person liability arises from the following facts: (i) the Executive Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations and books and records at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

341.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and

effect of concealing Molson's financial well-being and prospects from the investing public and supporting the artificially inflated price of its Class B Common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's consolidated financial statements, deferred tax benefits, net income and retained earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading.

342. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Molson's Class B Common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's Class B Common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Class B Common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Molson's Class B Common stock during the Class Period at artificially high prices and were damaged thereby.

343. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Molson was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Molson's Class B Common stock, or, if they had acquired such Class B Common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

344. By virtue of the foregoing, Molson and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

345. As a direct and proximate result of Defendants' wrongful conduct, Lead

Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Class B Common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

346.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

347.     Each of the Individual Defendants acted as controlling persons of Molson within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions as officers and/or directors of the Company, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

348.     In particular, Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the Class B Common stock violations as alleged herein, and exercised the same.

349.     As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members

of the Class suffered damages in connection with their purchases of the Company's Class B Common stock during the Class Period.

## XVIII. **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIX.   **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.


Dated: December 9, 2019                          *s/ Betsy C. Manifold*
                                                   Betsy C. Manifold

                                       Betsy C. Manifold
                                       Rachele R. Byrd
                                       Marisa C. Livesay
                                       Brittany N. DeJong
                                       WOLF HALDENSTEIN ADLER
                                         FREEMAN & HERZ LLP
                                       750 B Street, Suite 1820
                                       San Diego, CA 92101
                                       Tel: (619) 239-4599
                                       Fax: (619) 234-4599
                                       manifold@whafh.com
                                       byrd@whafh.com
                                       livesay@whafh.com
                                       dejong@whafh.com

                                       Matthew M. Guiney
                                       Regina M. Calcaterra
                                       Kevin G. Cooper

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
calcaterra@whafh.com
kcooper@whafh.com

*Lead Counsel and Counsel for Lead Plaintiffs*
*Metropolitan Transportation Authority Defined*
*Benefit Pension Plan Master Trust and Manhattan*
*and Bronx Surface Transit Operating Authority*
*Pension Plan*

Karen Cody-Hopkins
CODY-HOPKINS LAW FIRM
4610 S. Ulster Street, #150
Denver, CO 80237
Tel.: (303) 221-4666
Fax: (303) 221-4374
karen@codyhopkinslaw.com

*Local Counsel for Lead Plaintiffs*
*Metropolitan Transportation Authority*
*Defined Benefit Pension Plan Master Trust*
*and Manhattan and Bronx Surface Transit*
*Operating Authority Pension Plan*

Molson: 26018.v5